**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

COLLEEN B. BEAMAN, DAVID H. MOSS, and ANAM CARA LLC, a Wisconsin Limited Liability Company,

Plaintiffs,

Case No.

Judge:

v.

EAGLE HARBOR TOWNSHIP, a Michigan municipal corporation; RICHARD PROBST, JR., individually and in his official capacity as Township Supervisor; SUSAN HOCKINGS, individually and in her official capacity as Zoning Administrator; LAURA BONDE, individually and in her official capacity as Planning Commission Chair; and KERRIE RICHERT, individually and in his official capacity,

Defendants,

---

David A. Nacht (P47034)
**NACHTLAW, P.C.**
Attorneys for Plaintiffs
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
Telephone: (734) 663-7550
dnacht@nachtlaw.com

---

**COMPLAINT AND JURY DEMAND**

Plaintiffs COLLEEN B. BEAMAN, DAVID H. MOSS, and ANAM CARA LLC, by and through their counsel, NACHTLAW, P.C., complain and allege as follows:

## INTRODUCTION

1. This action arises from Eagle Harbor Township's development, adoption, interpretation, implementation, and enforcement of a regulatory scheme governing short-term rentals ("STRs") that Plaintiffs allege violated multiple protections guaranteed by the United States Constitution. In administering that regulatory scheme, the Township and its officials burdened Plaintiffs 'property rights, denied or revoked STR permits, conducted a warrantless inspection of Plaintiffs 'private property, and retaliated against Plaintiffs for petitioning the government and challenging Township conduct.

2. Plaintiffs allege that the Township interpreted and applied its STR regulatory scheme unevenly. Certain existing STR operators were grandfathered or administratively exempted from requirements imposed on Plaintiffs, while Plaintiffs encountered restrictions and administrative barriers affecting the lawful use and development of their property.

3. Among the operators receiving materially different treatment was Township Supervisor Richard Probst, Jr., who operates two STRs in the RS-1 Resort Services District and participated extensively in the development and implementation of the Township's STR regulatory scheme while holding a direct financial interest in its outcome.

4. Plaintiffs bring this action under 42 U.S.C. § 1983 and seek declaratory and injunctive relief, compensatory and punitive damages where authorized by law, attorney fees and costs, and such other legal and equitable relief as the Court determines appropriate.

**PARTIES**

5. Plaintiff ANAM CARA LLC is a Wisconsin limited liability company with its principal place of business in Whitefish Bay, Wisconsin. Anam Cara LLC owns five contiguous parcels (or "lots") of real property located at 11627-11657 Washington Mine Road, Mohawk, Michigan, in Eagle Harbor Township, Keweenaw County, Michigan (the "Property" or "Anam Cara").

6. Plaintiff DAVID H. MOSS is a resident of Wisconsin and a member and manager of Anam Cara LLC.

7. Plaintiff COLLEEN B. BEAMAN is a resident of Wisconsin and a member and manager of Anam Cara LLC.

8. Moss and Beaman are the sole members of Anam Cara LLC.

9. Defendant EAGLE HARBOR TOWNSHIP ("Township") is a Michigan municipal corporation located in Keweenaw County, Michigan. The Township is a "person" subject to suit under 42 U.S.C. § 1983 for constitutional injuries caused by its official policies, customs, practices, enactments, and decisions of officials possessing final policymaking authority.

10. Defendant RICHARD PROBST, JR. has served as Eagle Harbor Township Supervisor since 2012 and also serves as Township Assessor and Fire Chief. Probst operates two STRs in the Township's RS-1 Resort Services District. Plaintiffs allege that Probst participated in the development, interpretation, implementation, and administration of the Township's STR regulatory scheme while holding a direct financial interest in its outcome. He is sued individually and in his official capacity as Township Supervisor.

11. Defendant SUSAN HOCKINGS has served as Eagle Harbor Township Zoning Administrator since approximately May 2024. Before becoming Zoning Administrator, Hockings served on the Township Planning Commission beginning in May 2022 and participated in the development of the STR Zoning Ordinance Amendment. She is sued individually and in her official capacity as Zoning Administrator.

12. Defendant LAURA BONDE has served as Chair of the Eagle Harbor Township Planning Commission since May 2022 and was previously a member of the Commission. Bonde operates an STR and participated in the development, deliberation, and recommendation of the STR Zoning Ordinance Amendment while holding a financial interest in its outcome. She is sued individually and in her official capacity as Planning Commission Chair.

13. Defendant KERRIE RICHERT served on the Eagle Harbor Township Planning Commission during development of the Township's STR ordinance. In August 2025, Richert was retained by the Township as a Zoning Administrator Assistant to conduct STR compliance inspections and conducted the inspection of Plaintiffs 'Property described below. He is sued individually and in his official capacity.

## JURISDICTION AND VENUE

14. This action arises under 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

15. This Court has supplemental jurisdiction over Plaintiffs 'related state-law claims under 28 U.S.C. § 1367(a).

16. Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201 and 2202 and injunctive relief as authorized by law.

17. Plaintiffs seek reasonable attorney fees and costs on their federal constitutional claims under 42 U.S.C. § 1988.

18. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs 'claims occurred in Keweenaw County, Michigan, within the Western District of Michigan, Northern Division.

## FACTUAL ALLEGATIONS
## I. EAGLE HARBOR TOWNSHIP AND ANAM CARA

### A. Township Setting and Governance

19. Eagle Harbor Township is a general law township in Keweenaw County, Michigan, with a year-round population of approximately 217, down 23% since 2000. Its principal population center is the approximately 82-acre Village of Eagle Harbor, with a permanent population of 69 persons and a density exceeding 500 persons per square mile, compared with approximately 2.6 persons per square mile in the rural areas comprising approximately 99.8% of the Township's peninsula land area.

20. Approximately 70% of the Township's 486 housing units are seasonal. The Township's 2021 Comprehensive Plan describes a tourism-dependent community shaped by retirement and vacation homes and having a "minimal economy." It identifies housing blight as an issue, but identifies no comparable STR problem, while noting that seasonal rentals had increased.

21. The Village consists largely of small lots and closely situated homes and cottages. The Township's rural areas include large wooded parcels, inland lakes, and residences separated by substantial distances. Many concerns later invoked to support STR restrictions — including density, parking, congestion, noise, and neighborhood character — arose primarily from Village-type conditions.

22. The Township is governed by a five-member Board of Trustees. Unlike the other four townships in Keweenaw County, Eagle Harbor maintains its own five-member Planning Commission, Zoning Administrator, and Zoning Board of Appeals. When STR regulation began in 2021, Planning Commission members Mary Beyers and Laura Bonde operated STRs; Defendant Probst served as Township Supervisor, Assessor, and Fire Chief and operated two STRs.

23. Zoning Ordinance 1.6, adopted September 9, 2019, governed when Plaintiffs began STR operations. Zoning Ordinance 1.7 was adopted September 11, 2023 and became effective November 1, 2023.

24. Plaintiffs 'Property is in the R-3 Residential District, a rural district of approximately 7,696 acres — 21% of the Township's peninsula land area. The RS-1 Resort Services District encompasses approximately 18 acres in and around the Village commercial center and includes Probst's two STRs.

25. On June 14, 2021, all five Board members signed the Township's "Principles of Governance," committing themselves, among other things, to ethical conduct, transparency, impartial treatment, compliance with law, stakeholder participation, and avoidance of governmental decisions for personal gain.

**B. Plaintiffs 'Property and Preexisting STR Rights**

26. Plaintiffs acquired five contiguous parcels on Lake Medora between 2003 and 2021.

27. Anam Cara — meaning "soul friend" in the Celtic tradition — is the name Plaintiffs gave to their Property. The name reflects Plaintiffs 'vision for the Property from the beginning: not merely as a financial investment, but as a family retreat to be thoughtfully developed over time, shared with family and friends across generations, and ultimately passed to their children and grandchildren. That vision guided Plaintiffs 'acquisition, development, and investment decisions concerning the Property. Collectively, the Property comprises more than 12 acres and approximately 2,500 feet of shoreline on 700-acre Lake Medora.

28. Plaintiffs constructed a modest two-bedroom cabin on Lot 4 and a seasonal timber-frame screenhouse on Lot 6. The property is heavily wooded; the nearest regularly occupied dwelling is approximately one mile away.

29. Anam Cara is reached by traveling approximately 1.6 miles down private, unpaved Washington Mine Road and another 0.2 mile down Plaintiffs ' private driveway. Property owners along Washington Mine Road hold deeded access rights, but there is no governing road-maintenance or snow-removal agreement among them.

30. Anam Cara lies in one of the snowiest regions east of the Rocky Mountains, and without mechanical snow removal vehicular access ordinarily becomes impossible from sometime in November or December through April. Before 2023, Plaintiffs accessed the Property in winter by skiing in while hauling

supplies on a sled. STR revenue enabled Plaintiffs to begin commercial snow removal, making year-round vehicular access economically feasible. Snow-removal costs for the 2025–2026 winter totaled $9,168.

31. Plaintiffs 'long-term development plan contemplated additional modest cabins for use by their children, grandchildren, other family members, and friends, with lawful STR use when the cabins were not occupied by family. STR revenue was intended to help fund development, maintenance, private-road access, winter snow removal, and preservation of the Property for long-term family ownership.

32. Under Zoning Ordinance 1.6, "Tourist Homes" — dwellings rented in their entirety to transient guests — were permitted By Right in Plaintiffs 'R-3 District and in the other residential and Resort Services districts. "By Right" meant a use permitted without a special review and approval process.

33. The Township later used the term "Short-Term Rental" or "STR" for the same transient residential rental use previously regulated as a "Tourist Home." Accordingly, except when quoting ordinance language or historical records that use the term "Tourist Home," this Complaint refers to such uses as STRs.

34. Zoning Ordinance 1.6 permitted a principal dwelling and, on parcels of 1.5 or more acres, a second dwelling. Because STRs were permitted By Right in the R-3 District, each qualifying dwelling on Plaintiffs 'five parcels could lawfully be used as an STR under the zoning framework then in effect.

35. Plaintiffs began advertising their Lot 4 cabin on May 4, 2021 and hosted their first STR guests in June 2021. The use was lawful. Plaintiffs operated the Lot 4 STR as part of the integrated Property; guests used trails, shoreline, and recreational areas extending beyond Lot 4.

36. Before the Township adopted STR-specific restrictions, Plaintiffs made substantial expenditures in furtherance of their development plan, including acquisition of Lot 8, surveys, lot-line work, architectural planning, and other preparations. Their documented pre-regulation expenditures exceeded $330,000, exclusive of later legal expenses.

## II. THE FIRST STR ORDINANCE EFFORT: MAY 2021-MARCH 2022

### A. Initiation, August 12 Meeting, and Focus Group

37. On May 6, 2021, Zoning Administrator Bill Eddy first placed STRs on the Planning Commission's Future Topics List after inquiries from one or more realtors. Four days later, Board minutes recorded Eddy's acknowledgement that "[c]urrently there are no restrictions in the ordinance." The public record then identified no documented STR complaints, Township-specific study, or quantified STR-related harm.

38. Shortly thereafter, Supervisor Probst and the Planning Commission asked Township Attorney F. Michelle Halley to research STR regulation; three of

the six Township officials involved operated STRs. By May 27, 2021, Halley had completed research on various STR regulatory models and circulated a multi-page memorandum to the Planning Commission, Zoning Administrator Eddy, and Supervisor Probst outlining potential regulatory approaches.

39. On June 3, less than one month after the topic first appeared, the Commission formally initiated development of an STR policy or ordinance. At that same June 3, 2021 meeting, the Commission adopted the Township's 2021 Comprehensive Plan, which states that "[a] zoning ordinance is not a substitute for a comprehensive plan" and exists to "carry out the dictates of the comprehensive plan." The Comprehensive Plan contains no STR-specific policy or planning objective and identifies no STR-related problem requiring regulation.

40. The August 12, 2021 Planning Commission meeting became a formative event. Several existing or prospective STR operators attended after receiving advance notice. Probst, Beyers, and Bonde — all STR operators — participated. No documented complaint, empirical study, or impact analysis was presented. Member Sharon MacKenzie stated: "We don't know who is renting. We don't know the number of short term rentals in the Township."

41. Participants repeatedly framed concerns in terms of community ties and traditional ownership. Bonde contrasted traditional renters with those lacking community connections; Carol Bogart stated it was "a little disturbing when you

don't have roots and you are buying a building to just rent out to make money"; Beyers criticized newer, impersonal rental practices as "not what Eagle Harbor is about." Chair Duncan Wyeth concluded: "Bottom line is we need a product. And this isn't something we can wait another two years to get."

42. Prior to adjournment, the Commission convened an informal Ad Hoc STR Focus Group which met later that same day, composed principally of existing STR owners, nearly all from the Village area. Plaintiffs and owners of undeveloped rural property were not included. The Focus Group's written summary endorsed a maximum number or percentage of STRs and stated: "We know that we are 'grandfathered 'as current hosts."

**B. Plaintiffs 'Exclusion and the First Police Powers Draft**

43. Plaintiffs had already made their plans known to Zoning Administrator Eddy. On June 21, 2021, Moss wrote that Plaintiffs hoped to build small cabins "for use for family, friends and short term rentals." On July 1, he described the contemplated purchase of Lot 8 and explained that future STR income could support property and road maintenance and winter plowing.

44. During a July 16 follow-up telephone call, Eddy mentioned that "some folks in Eagle Harbor were concerned about STRs and discussing possible limitations" and referred to the lack of employee housing as a concern. Moss

explained why remote Anam Cara was unsuitable for employee housing and expressly asked to be involved in further discussions.

45. Eddy did not identify the "folks" as the Planning Commission, disclose that the Commission had already formally initiated regulation and retained counsel to research it, or tell Plaintiffs of the August 12 STR meeting. Three weeks after his conversation with Moss, several existing STR operators participated in that meeting and Focus Group while Plaintiffs remained unaware of the formal process.

46. During fall 2021, the Township developed a Police Powers Ordinance containing grandfathering, a Township-wide STR cap of 10% of dwellings, a two-STR-per-owner limit, a one-STR-per-parcel limit, and a minimum spacing requirement. The Planning Commission forwarded the draft to the Board on November 4.

47. Plaintiffs learned of the proposed ordinance by chance on November 8, when Moss contacted Probst to inform him that based on his July conversation with Eddy, Plaintiffs would not be pursuing a merger of their lots, because it was incompatible with their STR plan. Probst disclosed that the Planning Commission was forwarding an STR Police Powers draft to the Board.

48. The imminent adoption of a restrictive STR ordinance threatened Plaintiffs 'planned additional cabins. Plaintiffs could not reasonably proceed with

substantial construction expenditures intended to support future STR use while the Township was considering restrictions that could later prohibit that use.

49. Plaintiffs therefore suspended further implementation of their construction plans while communicating their concerns and proposed alternatives to the Township.

50. On November 15, Probst explained the rationale to Moss: the Township did not want community composition "spread so thin" that too few people remained for the volunteer fire department, emergency response, and Township government; with few exceptions, he said, the ordinance should preserve "historical and traditional uses" while allowing only "limited expansion."

51. On December 6, 2021, Plaintiffs submitted a ten-page response describing Anam Cara's remote character, their reliance on the existing Tourist Home framework, investments toward future development, and concern that Village-based issues were being imposed Township-wide. They emphasized that they did not oppose reasonable STR regulation. They also raised concerns regarding potential conflicts of interest among officials and existing STR operators participating in development of the ordinance.

52. The Board postponed action on December 13. Two days later, Probst wrote that the draft was "pretty close" and the Township needed to "stay ahead of the wave of potential rentals." On December 30, 2021, Probst circulated to the Board

of Trustees an article sharply critical of Airbnb and STR platforms, blaming short-term rental platforms for causing homelessness and skyrocketing housing prices. He added: “Obviously we aren't in this predicament currently, but certainly something we are trying to head off.”

**C. Escalating Dispute and March 2022 Hearing**

53. Plaintiffs continued urging the Township to gather data, identify actual problems, broaden community participation, and tailor regulation to materially different areas. In a private response to Plaintiffs ’January 5, 2022 letter to the Board, Beyers wrote: “After getting over my stroke after reading the Moss tome, I may be able to comment. He is completely ignorant of the problems in Eagle Harbor.”

54. In February 2022, Plaintiffs supplied the Township with a less restrictive ordinance used elsewhere as an example of a regulatory approach addressing public health, safety, and welfare without numerical caps, distance requirements, or ownership limitations. Bonde privately dismissed it in an internal email: “I didn't realize this was the ordinance Moss was suggesting. That's hysterical.”

55. Internal Township communications also reflected disagreement. Wyeth questioned whether restrictions beyond parking and noise were warranted outside the Village; Trustee George Bailey wrote that he did not see a significant need for an STR ordinance; MacKenzie questioned stakeholder participation.

56. By February 2022, Plaintiffs had identified potential conflicts of interest involving Probst and certain Planning Commission members and raised those concerns directly with Probst and the Board, citing the Township's Conflict of Interest Policy. Conflict of interest thereafter became a recurring issue in Plaintiffs' communications with Township officials.

57. Throughout this period, Plaintiffs maintained that they did not oppose reasonable STR regulation, but urged the Township to adopt regulations grounded in documented facts and tailored to the materially different characteristics of properties and areas within the Township. Private communications later obtained through FOIA reflected increasing hostility toward Plaintiffs and their proposals, as described below.

58. Before the March 10 public hearing, Plaintiffs retained attorney Matt Vermetten, who sent a letter to the Board on March 9, 2022 outlining legal concerns about the proposed Police Powers Ordinance.

59. The public hearing drew substantial participation and revealed significant division. Commenters questioned the absence of documented Township-wide STR problems, the application of Village concerns to rural properties, the pace and transparency of the ordinance-development process, and the limited group of stakeholders who had participated in developing the proposal.

60. Four days later, the Board unanimously returned the ordinance to the Planning Commission for additional work, directing broader stakeholder input and outside review of conflict-of-interest issues. The core restrictions developed during this first effort nevertheless remained the foundation of the later ordinance.

## III. THE SECOND STR ORDINANCE EFFORT: MARCH 2022-SEPTEMBER 2023

### A. Survey and Continued Development

61. After the March hearing, the Planning Commission developed an STR Survey. No public minutes identify how it was drafted or by whom, and Planning Commission records reflect no public meetings during this period. On Probst's motion, the Board mailed the Survey only to owners of improved property, excluding approximately 227 owners of vacant or unimproved land whose development rights could be directly affected. Responses were not anonymous.

62. The Survey framed the Township's objective as preserving the "residential community and participatory nature of Eagle Harbor." It asked whether respondents supported "an ordinance and registering STRs" without describing the actual cap, spacing requirements, per-owner and per-parcel limitations, or grandfathering provisions then under consideration. The Survey asked about STR concerns but not benefits or less restrictive alternatives.

63. Approximately 175 of 475 recipients responded. Plaintiffs ’review found that 47 respondents opposed any ordinance or registration, while only 44 affirmatively supported “an ordinance” with Township-wide application and fees. Narrative comments on both sides questioned whether Village-based concerns justified Township-wide restrictions.

64. In July 2022, the Commission formalized a two-STR-per-owner limit and a 401-foot spacing requirement for rural areas. On August 10, Plaintiffs proposed an open-enrollment approach that would permit existing property owners to register existing or planned STR use while remaining subject to generally applicable zoning and construction requirements.

65. A June 2022 draft had provided that advertising a property as an STR constituted prima facie evidence of operation. Plaintiffs were advertising both their existing STR and planned cabins. One day after Plaintiffs ’August 10 proposal, that advertising provision disappeared from the draft without recorded explanation.

66. Plaintiffs ’attorney repeatedly advised that the proposed Police Powers Ordinance contained zoning restrictions. On September 22, 2022, Township Attorney Halley agreed that “[b]ased on the components in the ordinance it is more of a land use ordinance than an activity ordinance.” The Township converted the proposal to a zoning amendment without materially changing the core restrictions.

**B. Spacing, Grandfathering, and Plaintiffs ’Proposed Alternatives**

67. Planning Commission member Richert later objected that the 401-foot spacing rule protected existing STRs while eliminating the same previously available right for neighboring homeowners. At the June 8, 2023 meeting he stated: "It creates different classes of people... That is totally unfair." Bonde responded that spacing was needed to "preserve communities and neighborhoods" and "not create a ghetto." Richert cast the only vote to eliminate the rule.

68. In July 2025, Bonde acknowledged that "neither the Planning Commission nor the Board had the information to determine if the distance requirements would be adequate to preserve single-family residential neighborhoods."

69. During spring and summer 2023, Plaintiffs repeatedly proposed a more tailored ordinance. Beaman submitted letters addressing the lack of Township-specific factual support, the Village/rural mismatch, and economic benefits of STR activity; the Planning Commission did not respond.

70. On June 26, Plaintiffs spoke with Bonde and Beyers. Bonde cited potential guest misconduct as a basis for the proposed ordinance but acknowledged she did not know whether two incidents she referenced involved STR guests. She also cited "loss of community" and expressed a preference for residents and guests who participated in local activities, including Fourth of July events such as selling hot dogs.

71. Bonde also described the Focus Group as "probably a misnomer" and "just a group who got together to discuss STRs," while Probst had previously written that the Planning Commission "used an ad hoc committee of STR owners to get started" on the framework.

72. Plaintiffs described surveys, lot-line work, architectural planning, advance reservations, and other steps taken toward future cabins. When asked how "existing" STRs would be defined for grandfathering, Bonde stated: "If there are plans already, we need to consider that" and "We can revisit 'existing.'"

73. Plaintiffs followed with a written open-enrollment or reliance-based grandfathering proposal. At a June 29 special meeting, the Commission rejected it, stating: "You cannot get a permit for an idea... The only people we are grandfathering in are people who are currently doing short term rentals." On July 2, 2023, Richert asked Bonde by email, "...would someone like David Moss be able to apply for a variance to allow him to get around some of the restrictions?" Bonde replied: "Probably. People like him always do."

74. On August 1, Vermetten proposed three alternatives: reliance-based grandfathering, limiting the restrictions to the Village, or an open enrollment period. The Township adopted none of those alternatives. Vermetten also identified the absence of meaningful supporting data and the structural unfairness

of a spacing rule under which whichever neighbor acted first could permanently foreclose the other's STR eligibility.

**C. Adoption and Findings of Fact**

75. The Planning Commission approved the STR Zoning Ordinance Amendment on August 3, 2023 and forwarded it to the Board. On September 8, Plaintiffs submitted a final letter addressing spacing, grandfathering, local-contact requirements, fees, and the Township's continuing inability to provide an accurate current STR count.

76. On September 11, 2023, the Board adopted Zoning Ordinance 1.7, effective November 1, 2023.

77. The accompanying Findings of Fact stated that the Township and County had experienced "significant growth" in STRs but cited no figures specific to the Township.

78. Several of the Findings of Fact did not directly answer the questions posed. One question asked the Township to identify an error in the prior ordinance; the response instead listed policy objectives. Another asked about public services; the response did not address public services but instead stated that limiting STRs to one per parcel was consistent with permitted lot usage, even though parcels of 1.5 acres or more could contain a second dwelling. A separate finding concerning

consistency with the Comprehensive Plan relied on language regulating commercial uses, although the Plan contained no STR-specific policy.

79. The final zoning ordinance retained the central restrictions first developed in the 2021 proposed Police Powers ordinance: grandfathering of existing operators, a numerical cap, two-per-owner and one-per-parcel limits, and spacing requirements, with the rural spacing distance reduced from 1,000 to 401 feet. Under the Township's STR ordinance, the numerical cap is calculated as a percentage of the total number of dwellings in the Township, as determined by the Township for the applicable calculation period.

## IV. PROBST'S CONFLICT OF INTEREST AND HIS STR EXEMPTION

### A. Participation, Disclosure, and Recusal

80. Supervisor Richard Probst and his wife Kelly Probst operate two STRs in Eagle Harbor's RS-1 zoning district: Walden, which they purchased in 2014, and Grandma's Cabin, which had been purchased by Probst's parents in 1997.

81. Under the Township's Conflict of Interest Policy, an official who determined that a potential personal-interest conflict existed was required to disclose the interest before consideration of the matter and abstain from participating in both the discussion and the vote.

82. Before any recorded disclosure of his STR interests, Probst participated extensively in development of the proposed ordinance. He attended the early Planning Commission meetings, stating: “We... need to get a list together of what we want to do and then take it to the attorney.” He also suggested that a permit ordinance might be adopted within 30 days, and later acknowledged that he and Clerk Olson had “tweaked” the draft before it was reviewed by Township counsel.

83. On December 30, 2021, Probst expressly raised his own financial position, writing: “...full disclosure, Kelly and I run the two rentals in RS1... should they be excluded from any/all of the provisions of this ordinance?”

84. Probst first formally recused at the January 10, 2022 Board meeting. Yet over the next several weeks he proposed an off-meeting workshop, participated in a special work session, met with Trustee Schaefer to insert changes and application forms, proposed how the percentage cap should be structured, and, after recusing at a January 27 meeting, returned to recommend sending the revised draft to counsel.

85. In an undated handwritten memorandum from the same period, Probst asked whether he could propose the ordinance’s direction while not participating in discussion and suggested: “No Space/distance outside H2O district — No % cap

outside H2O district — Only applies to Residential Districts R-1, R-2, R-3, CE." (Note: "Water/H2O" district is roughly synonymous with the Village.)

86. After Plaintiffs raised Probst's conflict of interest on February 13, Probst acknowledged his STR ownership but responded that, in a small town, officials would inevitably encounter issues "directly connected to us," and stated that he had recused during deliberations and voting. Two days later, in an email to himself, he acknowledged "the optics or appearance of me trying to limit competition," admitted, "I was the one, along with Jeane, who entered the changes into the draft," questioned limits on his private discussions with Board members, and concluded: "My thoughts... Enact this ordinance."

87. On February 17, Richert advised Probst that he could have "more to lose than to gain with restrictions in place" and that opposing restrictions could provide him a personal benefit because existing zoning allowed Tourist Homes without those restrictions. Probst agreed the issue could be perceived as a conflict and wrote: "I will abstain from publicly trying to push this one way or the other."

88. Probst nevertheless continued participating in STR matters. Among other things, he moved to approve mailing of the STR Survey and later analyzed its results; was instrumental in hiring consultant Patrick Coleman to assist with the STR ordinance; communicated with Planning Commission members about STR issues; and, despite intermittent formal recusals from STR agenda items, moved or

seconded several STR administrative measures, including the Forms Packet, fee schedule, and revised Cover Letter.

**B. Development of the RS Carve-Out**

89. Under Zoning Ordinance 1.6, Tourist Homes were permitted By Right in both Residential and Resort Services districts. At an October 21, 2021 meeting, Zoning Administrator Eddy stated that RS-1 and RS-2 STRs would require permits under the proposed ordinance; on November 4, when Kelly Probst asked whether RS rentals would count toward the owner maximum, the response was that zoning districts were not being used.

90. Against that background, Probst's December 30 inquiry to his fellow board members asked whether his own RS-1 rentals should be excluded. On February 16, 2022, he wrote that his two rentals were in a mixed-use district (RS-1) and "may not even be controlled by this particular ordinance." His handwritten memorandum proposed application only to Residential districts.

91. On March 10, Kelly Probst separately asked whether their two RS-1 STRs should be included in STR counts and, because they were in Resort Services zoning, "should it even be included?"

92. In June 2022, Open Skies LLC, owner of the only improved property in RS-2, requested either an express RS-1/RS-2 exemption or a permanent waiver process. Although the proposal was still a Police Powers Ordinance with no district

classifications, the Planning Commission on July 7 "agreed that their property would not be covered by the STR Ordinance as they are in one of the RS Zoning Districts." Bonde confirmed the same in writing and to the Board.

93. After the Township converted the proposal to zoning, the Commission formally classified STR use in RS-1 and RS-2 as "R" (by right) and Residential districts as "RC" (by right with conditions) without recording a rationale.

**C. Coleman's Uniform Draft and the May 4 Change**

94. The Township retained planning consultant Patrick Coleman, the domestic partner of Planning Commission member Susan Hockings, to assist with the zoning amendment. On March 9, 2023, Coleman produced a uniform draft providing that STRs were "allowed by right, with conditions, in all Zoning Districts."

95. At the Planning Commission's first 2023 meeting, on May 4, the Commission changed RS-1 and RS-2 from "RC" to "R" while retaining "RC" for R-1, R-2, R-3, CE, and AG. Probst and Coleman were present. The minutes record no discussion or rationale for the change.

96. The change benefited a small, identifiable group, including Probst's two RS-1 STRs, Anne Smith's RS-1 STR, and the Open Skies RS-2 property. The "By Right" designation gave RS-1 and RS-2 STRs an advantage beyond grandfathering. Other grandfathered STRs operating under a "By Right with Conditions" designation could lose their grandfathered status upon transfer if the property did not satisfy

ordinance requirements such as spacing, numerical caps, or per-owner limits. By contrast, an RS-1 or RS-2 STR designated "By Right" was not subject to those conditional restrictions upon transfer.

**D. Ordinance Text Versus Post-Adoption RS Exemption**

97. The final ordinance did not expressly exempt RS STRs from its general requirements. Section 10.12.33.C, titled "Short Term Rental Standards," states: "The following standards shall apply to all STRs in Eagle Harbor Township." Those standards include registration and permitting, applicable fees, designation of a local contact person available twenty-four hours a day and able to respond within sixty minutes, occupancy limits, confinement of lodging to the STR structure, on-site parking, compliance with applicable health, safety, and fire codes, nuisance obligations, display of the Good Neighbor Guide, remedial action on violations or complaints, and notice of changes in ownership or management. Section 10.12.33.B.1 separately states that existing STR owners "must register" to obtain a permit, and Section 10.12.33.B.7 makes it a violation for "anyone" to advertise an STR "without first receiving a permit."

98. The ordinance's definitions likewise did not equate "By Right" with exemption from applicable standards. "By Right" is defined as a use permitted without special review "provided the application demonstrates conformance with all the applicable nondiscretionary standards," and a permitted use must "conform[]

with all the requirements, regulations, and performance standards" applicable to the district. Consistent with those definitions, the opening paragraph of Section 10.12.33 states that STRs are By Right in RS-1 and RS-2 and By Right with Conditions elsewhere "when in conformance with the following requirements and standards."

99. On October 9, 2023, the Board adopted an STR Cover Letter on Probst's motion stating: "Starting on May 1, 2024, anyone operating or advertising a Short Term Rental in Eagle Harbor Township must have a STR Permit."

100. Yet at the November 2, 2023 Planning Commission meeting, Probst asked whether his RS-1 STR required a permit, and the minutes state that RS-1 and RS-2 STRs "do not require a permit." No ordinance provision was cited. Those minutes were not posted at the time; Plaintiffs did not discover the meeting or the recorded interpretation until June 25, 2026.

101. Probst's two STRs and Anne Smith's RS-1 STR thereafter operated without permits or the accompanying permit requirements. Plaintiffs did not discover until February 2025 that neither of Probst's STRs — Walden nor Grandma's Cabin — had applied for or obtained an STR permit, despite both being actively advertised and operated on Airbnb.

102. After Plaintiffs filed formal zoning complaints in March 2026 regarding the exemptions for Probst's and Smith's STRs, Zoning Administrator Hockings wrote: "Any property providing lodging within the RS district is not

required to obtain a separate STR permit under the current ordinance," again without citing an ordinance provision.

103. Thus, a process that began with the Zoning Administrator stating that RS STRs would require permits, and culminated in an ordinance whose operative provisions referred to "all STRs," "anyone," and compliance with applicable standards, was administered to exempt the three RS-1 STRs, including Probst's two properties, from the permit program.

## V. OTHER PLANNING COMMISSION CONFLICTS

104. Beyers and Bonde, both STR owners, participated throughout ordinance development. After the Township attorney circulated conflict guidance in April 2022, Beyers asked whether she, Bonde, and Probst should refrain from STR discussions. Probst replied that he would have difficulty concluding Beyers and Bonde had conflicts because they did not rent regularly.

105. At the May 5, 2022 Planning Commission meeting, the Commission considered the issue and voted that neither Beyers nor Bonde had a conflict. Both thereafter continued participating in STR deliberations and votes.

106. In November 2022, the Planning Commission recommended retaining Patrick Coleman, the domestic partner of Planning Commission member Hockings, as its planning consultant. Beyers warned: "I feel we are on dangerous ground to hire

the significant other of a P and Z Commission member... it will lead to charges of conflict of interest." The Township nevertheless retained Coleman; the record reflects no Hockings recusal or independent conflict review. On June 23, 2024, after Hockings had become Zoning Administrator, Plaintiffs wrote to her directly regarding this same relationship, stating that her 2022 vote to recommend Coleman's retention, without competitive bidding or disclosure of her personal relationship with him, presented an undisclosed conflict of interest, and that Coleman continued to earn income providing services to the Planning Commission for its Master Plan.

107. After Beyers left the Commission, Thomas Healy, owner of three STRs, joined in May 2024 and later participated in STR matters subject to specific recusals described below. Hockings left the Commission to become Zoning Administrator and was replaced on the Commission by her son, Anthony Carter.

108. Additional conflict-of-interest issues arising during administration of the ordinance, including those associated with the 2025 cap reduction, are addressed in later sections.

## VI. POST-ADOPTION ADMINISTRATIVE MATERIALS

### A. The STR Forms Packet

109. At the September 11, 2023 Board meeting adopting the STR Zoning Ordinance Amendment, questions arose concerning administration and enforcement. Township Attorney Halley, participating by telephone, stated that

"administrative details" need not be included in the ordinance itself and could be addressed later.

110. The Planning Commission subsequently developed an "STR Forms Packet" at meetings on October 5 and October 9, 2023. Later on October 9, on a motion by Probst, the Board adopted the Forms Packet, consisting of an STR Permit Application, Permit Application Cover Letter, Good Neighbor Guide, and STR Rental Registration Certificate. None had been included in the ordinance presented at the public hearing.

111. The Permit Application Cover Letter stated: "A Short Term Rental Permit cannot be issued for a camper, RV, tent, boat, vacant lot, etc." The ordinance itself prohibits lodging only in a "recreational vehicle, camper, tent or similar structure" and contains no reference to a "vacant lot, etc." The Township later relied on that post-adoption language ("vacant lot, etc.") to deny STR permits for Plaintiffs 'undeveloped Lots 5 through 8.

112. The Good Neighbor Guide states: "Special events, groups exceeding the posted occupancy limit are prohibited." Neither "special event" nor "group" is defined in the ordinance or Guide. The Guide also references "the beach, ballyard and neighborhood streets" — all Village-specific features not applicable elsewhere.

113. The STR Rental Registration Certificate states: "Certificate must be displayed in a visible first floor window at all times." That requirement does not

appear in the STR provisions of Zoning Ordinance 1.7. In August 2025, Township officials relied on the display requirement when conducting compliance inspections on private property, including Plaintiffs 'Property, as described below.

**B. Inconsistent Treatment of the Cover Letter**

114. The original Cover Letter also stated that "anyone operating or advertising a Short Term Rental in Eagle Harbor Township must have a STR Permit." As described above, the Township did not apply that requirement to Probst's two STRs, Anne Smith's STR, or other STRs it later treated as exempt from the permit system.

115. The same Cover Letter stated: "This permit only applies to the rental of an entire dwelling unit" and "does not apply to the short-term rental of a portion of a dwelling unit." The ordinance's definition of an STR refers to transient guests renting "the entire dwelling unit," but does not separately define or regulate rental of a "portion of a dwelling unit."

116. On April 6, 2025, Plaintiffs relied on this language in advising Probst and Hockings that because portions of the Lot 4 cabin remained locked and unavailable to guests, their operation did not involve rental of the entire dwelling unit. On April 14, Plaintiffs withdrew STR Permit #44 for Lot 4 on that basis.

117. Less than ten hours later, on April 14, 2025, the Board, on Probst's motion, voted 4-0 to revise the Cover Letter. The revision (a) removed the statement

that "anyone operating or advertising" an STR required a permit; (b) removed the statement that the permit applied only to rental of an "entire dwelling unit"; and (c) removed the statement that it did not apply to rental of a "portion of a dwelling unit."

118. On May 2, 2025, Hockings rejected Plaintiffs 'interpretation of the superseded Cover Letter, stating that the ordinance "must be interpreted as written" and that documents appurtenant to it "are meant only to assist the public."

119. The Township thus treated the Cover Letter language differently depending on which provision applied to whom. Its added "vacant lot, etc." language was relied upon in denying Plaintiffs 'permit applications for Lots 5-8; its "entire dwelling unit" language was deemed nonbinding by the Township when Plaintiffs relied upon it; and its language that "anyone operating or advertising" an STR required a permit was not applied to STRs the Township treated as exempt, such as those operated by Probst.

## VII. STR-SPECIFIC LIABILITY AND PENALTIES

120. Zoning Ordinance 1.7 imposes obligations and penalties specifically on STR permit holders that are not applicable to other residential property owners, rental property owners, or accommodation providers in the Township.

121. Section 10.12.33.C.5(b) requires an STR owner to "ensure that the guests of the permitted STR do not create a nuisance to the community." No comparable provision makes owners of long-term rentals, motels, hotels, or bed-and-

breakfasts responsible under the zoning ordinance for ensuring that their guests do not create a nuisance. The Township had separately adopted a general Public Nuisance Prohibition and Noise Control Ordinance (No. 2020-01) on September 14, 2020, before the STR ordinance process began, establishing specific and measurable standards, including that sound not be audible beyond 100 feet between midnight and 7:00 a.m. Section 10.12.33.C.5(b) neither references nor incorporates that ordinance.

122. Section 21.7.C also establishes an enforcement scheme specific to STR permits. An owner found to hold more than two STR permits is subject to revocation of all STR permits and may not reapply for twenty-four months. Separately, three violations within one calendar year, or violations occurring in any three consecutive calendar years, require permit revocation and the same twenty-four-month bar on reapplication.

123. The Township's general zoning-enforcement provisions in Section 21.7.A do not impose comparable mandatory permit revocation and twenty-four-month disqualification provisions for other zoning violations.

## VIII. PLAINTIFFS '2024 STR PERMIT APPLICATIONS: DENIALS AND REVOCATION

### A. Plaintiffs 'Applications and Initial Decisions

124. On April 24, 2024, Plaintiffs submitted five STR permit applications to Zoning Administrator Marjee Marshall, one for each of their five contiguous lots, accompanied by a detailed cover letter and supporting documentation. At the time, the Township's stated cap was approximately 89 STR permits, and slightly more than 40 permits had been issued.

125. Plaintiffs had inspected the Township's STR permit files through FOIA on April 11. Of the 31 permits then issued, only 13 applications complied fully with the stated application requirements. Twelve lacked required proof of ownership, ten lacked required site plans, at least four lacked required rental-history documentation, and at least two identified local contacts located more than 60 minutes away. No applications had been denied as incomplete.

126. Plaintiffs 'applications included proof of ownership and site plans for each lot, rental history for the existing Lot 4 STR, continuous advertising of planned cabins on Lots 5 through 8 since 2021, approximately two dozen advance reservations, and documentation of development efforts including surveys, lot-line adjustments, architectural work, builder and excavator involvement, and a Memorandum of Understanding with a builder. Plaintiffs also addressed their grandfathering claim, the integrated use of the five-parcel Property, and their objection to the post-adoption "vacant lot, etc." restriction described above.

127. On April 30, Marshall approved permits for Lots 4 and 6 and denied Lots 5, 7, and 8 on "vacant land" grounds. In approving Lots 4 and 6, Marshall wrote: "I am approving the permits for Lot 4 and Lot 6 because they each have a physical structure that can be rented."

128. Plaintiffs 'Lot 6 application, however, sought a permit for a future two-bedroom cabin to be constructed on that lot; it did not seek an STR permit for the existing seasonal structure known as the Point House. Although the Point House had been rented on rare occasions to Lot 4 guests for daytime use, Plaintiffs had not represented it as the dwelling for which the Lot 6 permit was requested.

**B. Revocation of Lot 6 Permit #45**

129. Marshall resigned as Zoning Administrator effective May 1, 2024, one day after issuing the permits. She was succeeded by Susan Hockings, who had served on the Planning Commission during development of the STR ordinance and had voted to advance and recommend it. Hockings had also served on the Township's Zoning Board of Appeals and remained listed on the Township's website as a member through at least August 20, 2024.

130. On May 14, 2024, within two weeks of taking office, Hockings notified Plaintiffs that Permit #45 for Lot 6 was being revoked because the Point House did not qualify as a "dwelling unit" and the permit had therefore been issued in error. Plaintiffs immediately responded that their application had not sought a permit for

the Point House and had never represented that structure as the proposed STR dwelling.

131. Hockings reiterated the revocation in a June 10 certified letter and demanded return of the permit. Plaintiffs disputed the factual and legal basis for the revocation, noting that Marshall had knowingly approved Lot 6 after reviewing Plaintiffs 'application and supporting materials, and declined to surrender the permit.

132. On July 16, Hockings acknowledged that a permit had been issued but characterized it as "mistaken" and stated: "If you offer or utilize any of your property (other than Lot 4) as an STR, you will be in violation of the township's zoning ordinance, and the township will enforce its zoning ordinance."

133. Around this time, Hockings revoked Permit #14 previously issued to Cory Howes based on a similar interpretation of "dwelling unit." Howes later wrote to Probst that Hockings had "clearly showed an attitude of disliking short term rentals" and told him that her daughter was living in a tent and that "STRs were the cause."

**C. Permit Outcomes**

134. Forty-nine STR permit applications were submitted before the April 30, 2024 grandfathering deadline. Forty-six were initially approved. The only three applications initially denied were Plaintiffs 'applications for Lots 5, 7, and 8, each denied on "vacant land" grounds.

135. Two of the forty-six initially issued permits were later revoked: Plaintiffs 'Permit #45 for Lot 6 and Howes's Permit #14. Every other application was approved and remained approved, including applications missing required documentation.

136. Thus, following the initial grandfathering process, Plaintiffs held only the Lot 4 permit despite having submitted five applications with extensive supporting documentation, while the Township had issued only approximately half of its stated cap of 89 permits and simultaneously treated at least nineteen additional operating STRs as exempt from the permit requirement altogether, as described below.

## IX. SELECTIVE ENFORCEMENT AND UNEQUAL TREATMENT OF SIMILARLY SITUATED OPERATORS

### A. Grandfathering and Plaintiffs 'Contiguous-Property Theory

137. The STR Zoning Ordinance Amendment provides: "Owners utilizing their property as STRs at the time of this Ordinance amendment enactment may continue to do so." The ordinance does not define "property" or "utilizing." The Township's zoning definitions provide that a "lot" or "parcel" may consist of "a combination of contiguous lots of record."

138. Plaintiffs 'existing STR use encompassed the integrated five-parcel Property, and their documented pre-enactment advertising, reservations, planning, expenditures, and communications concerning future cabins further supported grandfathering of Lots 5 through 8. The Township rejected that position and treated only Lot 4 as an existing STR eligible for grandfathering.

**B. Fresh Coast and Cedar Point**

139. Fresh Coast Cabins operates ten STR units on a single approximately 24-acre parcel zoned R-3, the same zoning district as Plaintiffs 'Property. Cedar Point Cabins operates six STR units on two contiguous R-3 parcels totaling approximately 17 acres. Both operations appeared on official County or Township STR inventories.

140. Despite their R-3 zoning and multiple STR units, the Township treated both Fresh Coast and Cedar Point as exempt from the STR permit requirement. In response to Plaintiffs 'June 2025 FOIA request, Clerk Olson explained: "They are resorts in existence when [the] current zoning ordinance was passed."

141. Zoning Ordinance 1.7 defines a "Resort" as a place of seasonal entertainment, recreation, or lodging with a total building footprint, including associated buildings, of at least 10,000 square feet. Neither Fresh Coast nor Cedar Point meets that stated building-footprint requirement, and the ordinance contains no express historical-resort exemption.

142. Fresh Coast and Cedar Point also operated more dwelling units per parcel than the one-principal-dwelling and one-secondary-dwelling framework otherwise applicable to R-3 properties. Fresh Coast later added an STR unit and a commercial sauna, and Cedar Point expanded from four rental cabins to six, expansions of nonconforming uses that the Township allowed. By contrast, Plaintiffs 'planned development complied with the dwelling-unit limits applicable to their five R-3 parcels, yet only Lot 4 was ultimately granted an STR permit.

**C. Plaintiffs 'Formal Zoning Complaints**

143. On March 3, 2026, Plaintiffs filed five formal zoning complaints identifying STR properties operating without permits: Probst's two RS-1 STRs, Anne Smith's RS-1 STR, and Fresh Coast's and Cedar Point's STRs.

144. Hockings 'response to the Probst/Smith complaints is addressed in Paragraph 102. On March 4, Hockings responded to the Fresh Coast and Cedar Point complaints, stating that they "historically operated as lodging facilities or resorts prior to the adoption of the current STR ordinance and have continued to do so," and that STR activity is "regulated differently depending on the zoning district in which the property is located."

145. To Plaintiffs 'knowledge, those five complaints — involving nineteen STR units — remain the only documented STR-related complaints appearing in the Township's public record since the ordinance process began in 2021.

**D. Other Grandfathered Operators**

146. In January 2022, after the STR ordinance process had begun, Thomas Healy purchased an R-1 property containing three STRs and was assured by the Township that the existing rentals would be grandfathered. Healy later joined the Planning Commission and participated in STR matters while holding those permits.

147. In July 2025, the Township also extended grandfathered treatment to Thomas Wakeman, an R-1 property owner, on the stated justification of "pre-ordinance usage as an STR, though years had lapsed."

148. Plaintiffs 'reliance and operational history was substantially more extensive: continuous STR operation since 2021, advertising of future cabins, advance reservations, documented development expenditures, and repeated communications with Township officials concerning their plans.

149. The Township therefore applied grandfathering and exemption principles differently among STR operators. Existing multi-unit R-3 operations were exempted. Lapsed prior use was accepted as sufficient for grandfathering. Healy's three-unit operation was preserved, while Plaintiffs 'claims to grandfathered treatment for Lots 5 through 8 were rejected.

## X. EVERY AVENUE CLOSED: THE 2025–2026 PERMIT DENIALS

**A. The 2025 Reapplications**

150. In March 2025, Plaintiffs again applied for STR permits for Lots 5, 6, 7, and 8 for cabins-to-be-built and sought renewal of Permit #44 for Lot 4. The Lot 4 permit was renewed. The four other applications were returned with Plaintiffs' checks, each bearing only the handwritten notation: "Denied — Vacant Land." No written explanation accompanied the denials.

151. At the time, the Township had issued 48 STR permits—two more than in April 2024—while at least 19 operating STRs remained unregistered and unpermitted.

**B. The Third Lot 8 Application and Resolution No. 2026-1**

152. On December 29, 2025, Plaintiffs applied for an STR permit for Lot 8 for the third time, expressly stating that they were "NOT asking for a STR permit for vacant land" but for a structure to be built and used by family members and rented as an STR when not family-occupied. By then, the "vacant lot, etc." language had been removed from the STR Permit Application Cover Letter.

153. On January 5, 2026, Hockings denied the application because no dwelling yet existed on Lot 8, stating that issuance of a permit would constitute an "unauthorized and invalid zoning approval." In an accompanying sworn affidavit, Hockings stated that her decision was "based solely on the requirements of the Zoning Ordinance," was "not discretionary or arbitrary," and was consistent with past Township practice and "uniform enforcement."

154. No provision of the STR ordinance expressly stated that an STR permit could not be issued before construction of a dwelling, and Plaintiffs 'Lot 8 application was the Township's first pre-construction STR permit application.

155. On the same day she denied the application, Hockings sent the Board a Policy Memorandum recommending adoption of a resolution prohibiting STR permits for vacant or pre-construction parcels. The memorandum described recent applications as attempts to "reserve or vest STR rights before a lawful structure exists" and identified among the proposed policy's benefits: "Prevents claims of vested rights or permit reservation."

156. However, existing provisions of Zoning Ordinance 1.7 already contemplated advance approval of proposed uses. Section 18.8.2 required zoning-permit applications to identify "all existing and proposed uses of buildings, structures and land" and "the proposed number of sleeping rooms, dwelling units, occupants…", while Section 18.7.12 provided that a permit would expire if significant construction did not begin within one year, subject to a possible six-month extension.

157. On January 12, 2026, seven days after Hockings denied Plaintiffs ' application, the Board adopted Resolution No. 2026-1, providing: "Eagle Harbor Township shall not issue Short-Term Rental permits for parcels that do not contain a lawfully existing dwelling at the time of application." Thus, Plaintiffs 'application

and Hockings 'denial both preceded formal adoption of the policy on which the Township thereafter relied.

158. The STR regulatory regime as enacted and administered requires Plaintiffs and other owners of undeveloped property to incur substantial design, permitting, and construction costs without assurance that the completed dwelling will actually qualify for an STR permit. Eligibility could be lost at any time before completion if the Township-wide cap were reached or if, even at the last moment, a nearby owner within the spacing radius obtained a permit first, whether or not that owner actually intended to operate an STR. The Township provides no mechanism to reserve or conditionally secure STR eligibility in advance, unlike other uses under the zoning ordinance for which approval may be obtained before substantial construction costs are incurred.

**C. Zoning Board of Appeals**

159. Hockings advised Plaintiffs that the Lot 8 denial could be appealed to the Zoning Board of Appeals. Plaintiffs wrote to the ZBA on January 20, 2026, questioning whether the ZBA had jurisdiction because the denial presented a Township-wide interpretation of the ordinance rather than a parcel-specific variance issue. Plaintiffs asked the ZBA to advise whether an appeal was nevertheless appropriate.

160. The ZBA did not respond.

**D. Plaintiffs ’Request to Transfer Permit #44 to a Second Dwelling on Lot 4**

161. On December 30, 2025, Plaintiffs asked whether Permit #44 for Lot 4 would remain valid if they constructed a second dwelling of 480 square feet or less on the same parcel, ceased renting the existing cabin, and instead used the new dwelling as the parcel’s single STR. Effectively, Plaintiffs were requesting a transfer of Permit #44 to a second dwelling unit authorized under the Township’s zoning ordinance on the same parcel.

162. Hockings initially denied the request because Plaintiffs had referred to the proposed structure as an “accessory structure.” After Plaintiffs clarified that they meant a second dwelling authorized by Section 7.7.2, Hockings agreed that Section 7.7.2 permits such a dwelling but denied the request. She stated that using it as the STR while ceasing STR use of the existing cabin would make it “the primary lodging use of the property” rather than remaining subordinate. She further stated that Permit #44 “remains associated with the existing principal dwelling,” that the ordinance does not authorize relocating a permit to a new structure, and that “not prohibited” does not mean “allowed.”

163. The STR ordinance provides that only one STR may be rented on a parcel at a time and prohibits transfer of an STR permit from one property to another property or from one owner to another owner. Plaintiffs ’proposal involved the same owner and the same property. Zoning Ordinance 1.7 defines "Short Term Rental

(STR)" as "a commercial use which is subordinate to the principal use of a dwelling unit... in which transient guests rent the entire dwelling unit for up to, or less than, thirty (30) consecutive days at a time." Separately, Section 7.9.1.A of the ordinance, governing accessory uses and structures, provides that "accessory uses and structures must be subordinate to the principal use and structure on the subject lot in terms of area, extent and purpose." Section 10.12.33, the operative STR provision governing permits, registration, and requirements, does not use the term "subordinate" anywhere and states only that there is "[o]nly one (1) allowable STR per parcel."

164. The proposal would not have increased the number of STRs, affected the Township-wide cap, changed ownership or parcels, altered spacing, or increased STR density. The only change was which lawful dwelling on Lot 4 would be used as the parcel's single STR. Whenever an STR is occupied by rental guests, the permitted dwelling necessarily serves as the guests' primary lodging use of the property; that circumstance is not unique to Plaintiffs' proposed second dwelling. The record reflects no instance in which the Township invoked that circumstance, standing alone, to deny, condition, or restrict another STR permit.

165. By early 2026, Plaintiffs had repeatedly sought permits for Lots 5 through 8, requested advance approval before undertaking substantial construction, pursued clarification from Township officials and the ZBA, and sought to use an existing permit for a different lawful dwelling on the same parcel. Each avenue was

rejected. During this time, the Township continued to treat numerous other STR operations as exempt or grandfathered under differing interpretations of the ordinance.

## XI. TRANSPARENCY, RECORDKEEPING, OMA AND FOIA

### A. Public Access and Recordkeeping

166. As described above, the Township's June 2021 Principles of Governance committed its officials to "practice openness and transparency in our decisions and actions," to communicate Township issues to the public, and to "welcome the active involvement of stakeholders." On December 10, 2021, before Plaintiffs had raised conflict-of-interest concerns, Probst similarly told Moss that "the more input we see and hear the better," that Township meetings were available by Zoom, and that "all of the minutes are posted."

167. The Planning Commission, which developed the STR ordinance, did not provide comparable Zoom access. Plaintiffs 'requests for remote access or meeting recordings were repeatedly refused. Planning Commission minutes also frequently recorded little or none of the substance underlying STR decisions, including who raised an issue, positions taken, or the basis for the action ultimately taken.

### B. Planning Commission Recordings and Plaintiffs 'FOIA Requests

168. On July 28, 2024, Plaintiffs asked Planning Commission Chair Laura Bonde that Commission meetings be digitally recorded and made available because of concerns regarding the completeness and accuracy of the minutes. On August 1, Bonde informed Plaintiffs that meetings were already being recorded: "The meetings are recorded, and the recording is kept until the minutes of the meeting are approved at the next meeting the following month."

169. The following day, Plaintiffs submitted a formal FOIA request for the existing recording of the July 11, 2024 meeting and for future recordings. Bonde forwarded the request to Clerk Olson and Supervisor Probst on August 4. No recording was produced and no substantive response was provided.

170. Plaintiffs renewed their efforts in 2025. On June 10, Olson responded to Plaintiffs 'formal FOIA request by stating: "Eagle Harbor does not video record or audio record Township Board meetings or Planning Commission meetings." On July 11, she again stated: "The Planning Commission does not record meetings and has no plans to do so." Both statements conflicted with Bonde's August 2024 written confirmation that Planning Commission meetings were being recorded.

171. On July 25, 2025, Plaintiffs sought records concerning the Commission's recording practices, including when recordings had existed and copies of any remaining recordings. Olson responded that there were no recordings in existence and that the Commission did not record its meetings. Plaintiffs then

submitted a supplemental FOIA request seeking records identifying when meetings had been recorded, who made or deleted the recordings, when the recording practice changed, and communications concerning those matters.

172. On August 18, Olson denied the requests, accompanied by a signed Certification of Compliance in which Clerk Olson certified "that the public record(s) containing the information requested by Mr. Moss and Ms. Beaman does not exist" and "that the nonexistence of said public record(s) is the reason for the denial." The same letter, however, stated that "the Planning Commission records audio of meetings for the sole purpose of creating and approving minutes at a later date, at which time the recording is deleted." No records concerning the history, creation, deletion, or discontinuation of those recordings were ever produced.

173. The Certification did not address Plaintiffs 'twelve factual questions — when the practice of recording began, when it stopped, who decided to stop it, and why.

174. Plaintiffs appealed the FOIA denial on August 25, asserting, among other things, that the Township had failed to respond to their August 2, 2024 request while responsive recordings existed and that recordings had subsequently been deleted. On September 8, 2025, the Board denied the appeal 5-0 after asking Olson only whether she was the FOIA Coordinator and whether she had followed the

proper steps. No Board member questioned the conflicting statements concerning whether recordings had existed or when they had been deleted.

**C. Off-Record Planning Commission Activity**

175. The Planning Commission does not meet between its December and May meetings. Nevertheless, substantive STR work occurred during periods in which no public Commission meeting was held.

176. On March 14, 2022, four days after the STR public hearing, Bonde sent the Board a letter captioned "Letter sent on the behalf of the Planning Commission," containing specific ordinance recommendations and signed by four Planning Commission members. No public Planning Commission meeting or vote authorizing that letter appears in the record. During the same non-meeting period, drafts of the Township's STR Survey circulated among Commission members, members were invited to suggest revisions, and FOIA-produced records indicate participation by at least a quorum of the Commission.

177. Township officials had previously recognized the Open Meetings Act implications of such communications. In June and July 2021, Zoning Administrator Eddy warned Planning Commission members at consecutive meetings not to "reply to all" to group emails because doing so "could be a violation of the Open Meetings Act." FOIA productions later disclosed additional

email chains among Commission members concerning STR matters outside formal meetings.

**D. Meeting-Minute and Posting Failures**

178. The Township also repeatedly failed to make Planning Commission and Board minutes timely available, including the June 8, 2023 Planning Commission minutes, the November 2, 2023 Planning Commission minutes described above, and later Planning Commission and Board minutes that Plaintiffs had to identify as missing: recent examples being the June 4, 2026 and July 8, 2026 Planning Commission meetings, neither of which was posted as of July 21, 2026.

179. On November 21, 2025, Probst called a Special Board meeting for November 24 to advance the proposed STR-cap reduction. Plaintiffs have located no notice of that meeting on the Township's website or among the Township records available to them, and no minutes had been posted as of January 1, 2026, when Plaintiffs notified the Clerk of the omission.

**E. Incomplete FOIA Productions**

180. Across multiple FOIA productions, Plaintiffs encountered missing or truncated email text, omitted or redacted recipients, and reply or forwarding chains produced without the underlying communications they referenced. In some instances, later FOIA productions included additional portions of email chains that had not been produced earlier.

181. As a result, the complete scope of off-record communications concerning the STR ordinance, Plaintiffs, and related disputes cannot be determined from the Township's productions.

## XII. SELECTIVE REZONING AND PLAINTIFFS 'EQUAL-TREATMENT TEST

### A. Proposed Rezoning of STR Properties

182. During 2025, the Planning Commission considered rezoning several STR-related properties from Residential classification to Resort Services ("RS"). Under the Township's interpretation of the STR ordinance, RS classification would exempt those properties from STR permits, fees, contact-person requirements, postings, and other restrictions imposed on Residential-district STRs, including restrictions affecting continuation or transfer of STR status.

183. The earliest documented proposal appears in the October 3, 2024 Planning Commission minutes, when Supervisor Probst, appearing as a member of the audience, suggested expanding RS zoning to include properties on Lighthouse Road and Lighthouse Court. The properties that would have benefited included three STRs owned by Planning Commission member Thomas Healy, three owned by Carol and Barry Bogart, who had chaired the STR Ad Hoc Focus Group, and one owned by David Donnay. Probst subsequently proposed inclusion of property owned

by Rodney Westlake containing two STRs. No rezoning applications had been filed by those owners, and the minutes record no rationale for selecting those properties.

184. The proposal had substantial consequences under the Township's interpretation of the STR ordinance. The nine STRs operated by Healy, Bogart, Donnay, and Westlake would join Probst's, Anne Smith's, Fresh Coast's, and Cedar Point's STRs outside the permit system, bringing approximately 43% of all STR activity in the Township outside the ordinance. In addition, rezoning grandfathered Residential STRs into RS would remove restrictions that could otherwise affect their continuation or transfer.

185. At the June 5, 2025 Planning Commission meeting, the Commission formally took up the proposed rezonings and added Fresh Coast and Cedar Point to the properties under consideration for RS zoning. Fresh Coast's owner requested rezoning so the operation could expand to include liquor sales and possibly a gift shop; the minutes expressly noted that Fresh Coast was then R-3, that its existing use was grandfathered, and that the use could not be expanded, although, as noted above, both Fresh Coast and Cedar Point had previously expanded their operations.

186. The June 5 minutes stated that the proposed zoning changes were needed to make the Zoning Map consistent with the Township's recently adopted Master Plan. The Master Plan's identified "Recommended Zoning Updates," however, did not identify any of these properties. The only reference Plaintiffs

located supporting expansion of RS zoning was an unsigned handwritten comment placed on a map at a public Open House stating: "Increase RS areas (around the village area)." The Township stated that it did not know who wrote the comment. In addition to Planning Commission members in attendance at the Open House, approximately 17 people attended, Probst amongst them.

**B. Plaintiffs Investigate the Proposed Rezonings**

187. After learning of the proposed rezonings, Plaintiffs submitted a FOIA request on June 22, 2025 seeking their origin, justification, and procedural basis. Clerk Olson responded that Fresh Coast and Cedar Point had been proposed by their owners, while the Healy, Bogart, and Westlake rezonings had been proposed by Probst "to make map consistent with Master Plan." Asked for the justification, Olson wrote: "To make historical use fit zoning."

188. Olson also confirmed that properties rezoned to RS would be exempt from the STR ordinance: "They would be exempt. No permits, fees, listings of 24 hr contact person or required postings." She further confirmed that Fresh Coast and Cedar Point were R-3 properties, the same zoning district as Plaintiffs 'Property, and that neither had filed the formal rezoning application otherwise required of a property owner seeking rezoning.

**C. Plaintiffs 'Equal-Treatment Rezoning Request**

189. On June 22, 2025, the same date Plaintiffs learned about the proposed rezonings, Plaintiffs submitted a formal rezoning request asking that their five contiguous R-3 parcels be included among the properties being considered for RS zoning. Plaintiffs expressly framed the request as one of equal treatment, stating:

> "This rezoning is: 1) every bit as consistent with the township Master Plan as the rezoning for the other properties under consideration for similar rezoning, and 2) every bit as justifiable as the other properties under consideration for rezoning from Residential to RS."

190. Plaintiffs were not seeking to operate a resort, commercial lodging establishment, gift shop, restaurant, or other commercial enterprise. Their purpose was to test whether the Township would afford their Property the same favorable zoning treatment it was considering for other STR operators.

191. Plaintiffs supported the request with their ownership history, STR operations beginning in 2021, pre-ordinance development and reliance expenditures, and thirty-two numbered points addressing the comparative treatment of the properties. Among other things, Plaintiffs noted that Healy had purchased his three-STR property after the Township's STR-regulation process had begun, while Plaintiffs had acquired all five parcels and begun their STR operation beforehand; and that Plaintiffs 'planned development had conformed to the prior zoning framework, unlike Fresh Coast, Cedar Point, and other properties whose existing configurations involved nonconforming uses.

192. On July 8, Bonde told Plaintiffs that "[a]ll property owners requesting rezoning are required to submit the same forms and fees." Plaintiffs had complied with those requirements. Olson's subsequent FOIA response confirmed that Fresh Coast and Cedar Point had not. Neither Bonde nor Hockings substantively responded to Plaintiffs 'June 22 rezoning request.

**D. The Planning Commission Considers the Other Properties**

193. At its July 10 meeting, the Planning Commission recommended no zoning change for the Healy, Bogart, Westlake and Donnay properties. As to Fresh Coast and Cedar Point, however, the Commission deferred a decision.

194. Plaintiffs did not know the Commission's July 10 conclusions when they acted several days later because the meeting minutes had not yet been posted.

**E. Plaintiffs Withdraw Their Formal Application but Request the Same Treatment**

195. On July 14, 2025, Plaintiffs withdrew their own formal rezoning application in separate letters to Hockings and Bonde. The withdrawal did not abandon Plaintiffs 'equal-treatment request.

196. Plaintiffs explained to Hockings that they were withdrawing the formal application because they believed they were entitled to the same process being afforded the other STR operators, stating:

> "We withdraw our re-zoning application to have our property re-zoned from R-3 to Resort Services because we believe our property is entitled to the

> same 'relief' as other STR operators…whereby the Planning Commission is itself recommending a change in zoning from Residential to Resort Services." Plaintiffs further stated that they were "asking the Planning Commission to…maintain consistency with the approach taken with regard to the above-mentioned properties."

197. Plaintiffs separately told Bonde that they did not yet know what action the Planning Commission was taking regarding the other properties and asked that, if the Commission proposed or recommended the other properties for rezoning, it "maintain consistency" by treating Plaintiffs' Property the same way. Plaintiffs expressly requested a response. Bonde acknowledged the withdrawal but provided no substantive response.

198. On July 15, 2025, Clerk Olson responded to Plaintiffs' July 14 communication and wrote that "the Planning Commission has not made a recommendation on that change." Olson attached the preliminary July 10 minutes, which recorded "No Change" for the Healy, Bogart, Westlake, and Donnay properties and "No determination" for Fresh Coast and Cedar Point. Thus, by July 15, Township officials had written notice that Plaintiffs' formal application had been withdrawn and that any remaining request concerning Plaintiffs' Property was conditional upon the Commission proposing or recommending RS rezoning for the comparator properties.

**F. The Other Rezoning Matters Are Resolved**

199. At the August 7, 2025 meeting, the Planning Commission recommended no zoning change for Fresh Coast and Cedar Point, joining the other STR-related properties for which it had already recommended no change.

200. At the same meeting, however, the Commission considered the Eagle Harbor House, which was not then operating as a lodging establishment. Relying on its lodging use at the time of the 2007 Interim Ordinance, the Commission and Hockings concluded that it "would have been 'Grandfathered in 'and should be allowed to rent rooms," without any recorded finding that such lodging use had continued between 2007 and 2025.

201. Plaintiffs remained unaware of the Commission's August 7 recommendations. On August 28, Clerk Olson told Plaintiffs in person that no final decisions had been reached concerning the rezonings Plaintiffs had asked about, even though the August 7 minutes reflect recommendations of no zoning change for all of those properties.

## XIII. THE SEPTEMBER 4, 2025 PLANNING COMMISSION MEETING: PROCEDURAL EXCLUSION AND REPUTATIONAL HARM

### A. Withdrawn Application Is Treated as Pending

202. By September 4, 2025, Plaintiffs 'formal rezoning application had been withdrawn for more than seven weeks, the withdrawal had been acknowledged by Township officials, and the Planning Commission had recommended against

rezoning every other property that had formed the basis of Plaintiffs 'equal-treatment request. At no point had Plaintiffs 'rezoning request or its subsequent withdrawal appeared in publicly posted Planning Commission minutes.

203. On September 4, the Planning Commission held a regular meeting attended by Zoning Administrator Hockings, Supervisor Probst, and eleven guests identified in the minutes as "Washington Mine Road and US-41 property owners."

204. Under Public Comment, the minutes record that Eric Steier presented a letter signed by 54 residents and five individual letters opposing rezoning of Plaintiffs 'Property. Other audience members also spoke against the rezoning. The minutes additionally record receipt of a letter from Charles Miller, a Lake Medora resident and attorney representing other Lake Medora-West property owners, opposing Plaintiffs 'rezoning.

205. Hockings 'Zoning Administrator Report described the opposition as protesting "a zoning change request by David Moss/Colleen Beaman to change the zoning of their property from R-3 (Residential) to RS-2 (Resort Service) to allow them to have multiple rentals on their property without needing an STR Permit." The meeting minutes likewise stated under Old Business: "Planning Commission received a request from David Moss/Colleen Beaman to have the Planning Commission recommend rezoning their property on Lake Medora from R-3 (Residential) to RS (Resort Service)."

206. Neither the minutes nor Hockings 'report disclosed that Plaintiffs had withdrawn that request on July 14, that Bonde and Olson had acknowledged the withdrawal, or that Plaintiffs had expressly stated they did not seek to operate a resort but were asking for equal treatment with the other STR properties then being considered for RS zoning.

207. Plaintiffs received no notice that their withdrawn rezoning request would be discussed at the September 4 meeting and did not learn until September 17 that (a) the meeting had focused on their Property; (b) neighboring property owners had organized opposition; and (c) their withdrawn request had been presented publicly as though it remained pending.

**B. The Miller Letter and Organized Opposition**

208. On August 14, 2025, approximately one month after Plaintiffs withdrew their application and three weeks before the September 4 meeting, Charles W. Miller sent Township officials a letter opposing Plaintiffs 'rezoning on behalf of himself and other Lake Medora-West property owners and requested that it be circulated to Planning Commission members. The letter reflected opposition from owners associated with nine Lake Medora-West properties. A separate opposition letter was later signed by 54 Lake Medora residents.

209. Miller is the Keweenaw County Prosecuting Attorney and works in the same county building as Hockings. At the time of Miller's letter, no publicly posted

Planning Commission minutes identified Plaintiffs 'Property as a rezoning candidate. The June 5 minutes identified the other properties under consideration; the July 10 and August 7 minutes did not mention Plaintiffs 'application or its withdrawal. The first Planning Commission minutes publicly identifying Plaintiffs' rezoning request were those of the September 4 meeting itself.

210. Miller's letter raised "spot zoning" concerns regarding Plaintiffs' Property but did not raise the same objection regarding the Healy, Bogart, Westlake, Donnay, Fresh Coast, or Cedar Point properties that had been considered for RS zoning during the same period.

211. Miller's letter also stated that Plaintiffs 'rezoning request "was withdrawn after Eagle Harbor Township's Zoning Administrator requested payment of the required fee." It also asserted that the Planning Commission's July 2025 minutes indicated that Plaintiffs 'request might be considered after The Nature Conservancy decided whether to sell abutting property. Both assertions mischaracterized the contemporaneous record. Plaintiffs 'July 14, 2025 email expressly stated that they withdrew their application while requesting treatment equal to that afforded other similarly situated property owners seeking rezoning. The Township's FOIA production shows that, on July 25, 2025, the Township Clerk forwarded to Miller an email chain titled "Beaman-Moss Property" originating with Plaintiffs 'July 14 withdrawal email. Further, the July 2025 minutes 'reference to

awaiting a decision by The Nature Conservancy concerned a "Multifamily parcel by Lake Medora," a separately zoned area that did not include Plaintiffs 'Property.

212. Township records produced to Plaintiffs contain no communication correcting Miller's characterization of either the reason for the withdrawal or the status of the application. Bonde had personally acknowledged the withdrawal on July 15, and Hockings had received both the original application and the July 14 withdrawal letter. Nevertheless, Bonde chaired the September 4 meeting and Hockings 'report described Plaintiffs 'withdrawn application as an existing "zoning change request."

**C. Plaintiffs Were Excluded From the Process**

213. From approximately July 25 through September 17, 2025, Township officials, Miller, and neighboring property owners communicated and took action concerning Plaintiffs 'withdrawn rezoning request without Plaintiffs 'knowledge. Plaintiffs were not informed of the opposition, were not told their Property would be discussed on September 4, and were not afforded a contemporaneous opportunity to advise the Commission or neighboring owners that the application had already been withdrawn.

214. The Township's treatment of Plaintiffs 'withdrawn application differed materially from the process involving the other STR properties considered for RS rezoning. Plaintiffs had sought inclusion solely to require equal treatment; yet after

the comparator rezonings were rejected and Plaintiffs had withdrawn their own formal application, Plaintiffs 'Property alone became the subject of organized public opposition at a Planning Commission meeting.

**D. Resulting Harm**

215. Plaintiffs had owned property on Lake Medora since 2003. The record reflects no comparable organized opposition by Lake Medora neighbors directed at Plaintiffs before the September 4, 2025 meeting.

216. By publicly treating the withdrawn application as an active request to obtain RS zoning "to allow them to have multiple rentals…without needing an STR Permit," without disclosing either the withdrawal or its equal-treatment purpose, the Township supplied a materially incomplete premise for the public opposition while Plaintiffs were absent and unaware that their Property was being discussed.

**E. Plaintiffs Attempt to Correct the Record**

217. On October 24, 2025, Plaintiffs submitted a letter to the Planning Commission and Board of Trustees and requested that it be read aloud at the next meeting. The letter explained that Plaintiffs had never sought to operate a resort, that their rezoning request had been made to test equal treatment with other STR properties, that the request had been withdrawn, and that Plaintiffs had received no notice that their Property would nevertheless become the subject of organized

opposition at the September 4 meeting. Plaintiffs also reiterated the underlying unequal-treatment issue.

218. The November 6, 2025 Planning Commission minutes state only that a letter from Plaintiffs concerning the STR percentage cap and rezoning was received and read aloud. The minutes do not acknowledge that Plaintiffs 'rezoning application had been withdrawn before September 4, that their request had been based on equal treatment, or that the September 4 proceedings had omitted that context.

219. On November 8, Plaintiffs also contacted Miller to correct the record and invited further discussion. Miller did not respond. Plaintiffs separately contacted petition signers. On November 13, Hockings reported internally that a Lake Medora resident, Dickie Selfe, had raised concern about Plaintiffs 'communication, writing: "He is concerned that some on Lake Medora will believe it."

## XIV. THE AUGUST 20, 2025 WARRANTLESS INSPECTION

220. Since inception of the STR permit program, the Township has issued permit holders a Rental Registration Certificate bearing the instruction: "Certificate must be displayed in a visible first floor window at all times." The Certificate requirement does not appear in Zoning Ordinance 1.7; it was added after adoption as part of the STR Forms Packet approved by the Board on October 9, 2023.

221. Hockings later stated that the Certificate contains "local agent contact information which may be needed in case of emergency or for other purposes which

include non-compliance with the Zoning Ordinance." That ownership and contact information was already on file with the Township and could be provided to law enforcement or other appropriate authorities without requiring a Certificate to be displayed in a residence window where it could be read only by approaching the window at close range.

222. In August 2025, the Township initiated an inspection program covering all 45 permitted STR properties to determine compliance with the Certificate-display requirement. The Township later described the inspection as "a visual check of all properties that have an STR permit … [to] make sure they had their permit card in a location visible from the street or driveway." Neither the ordinance nor the Certificate itself states that the card must be visible from a street or driveway.

223. At Plaintiffs 'Property, no first-floor window is visible from a public road. Any person attempting to inspect a Certificate in a cabin window must travel onto private property and approach the cabin.

224. The Township hired Kerrie Richert to conduct the inspections. Richert had previously served on the Planning Commission during development of the STR ordinance and had publicly advocated additional STR restrictions. On August 7, 2025, Richert complained at a Planning Commission meeting about STR guests whom he believed had trespassed on his property adjacent to Lake Superior, and repeated the complaint at the August 11 Board meeting. The individuals were two

ten-year-old girls and one of their fathers, who had been swimming in Lake Superior and stopped to rest on a rock in the water within view of Richert's property. Richert confronted them and, according to the father's written declaration, used profanity during the encounter. Within days, Hockings retained Richert to inspect all permitted STR properties.

225. On August 20, 2025, Richert arrived at Plaintiffs 'Property without contacting Plaintiffs beforehand. He had no warrant, no prior consent from Plaintiffs, and provided no advance notice of the inspection.

226. To reach the Property, Richert traveled approximately 1.6 miles down Washington Mine Road, a private, unpaved road serving only the private property owners along its length. The road is marked by "Private Road" and "No Trespassing" signs where it leaves U.S. Highway 41, and similar signs mark several private driveways along the route.

227. Richert then entered Plaintiffs 'private driveway, drove through the open red gate, and continued approximately 0.2 miles to within approximately 50 feet of the cabin.

228. Richert parked within direct sightlines of the cabin entrance and Plaintiffs 'unscreened outdoor shower. The shower is immediately adjacent to the cabin, is not visible from any public road, and is specifically advertised to guests as

a secluded outdoor bathing area. A guest using the shower at the time of Richert's unannounced arrival would have been exposed to the inspecting Township official.

229. When Richert arrived, Plaintiffs 'rental guests — Levi Flair, his father Joseph Flair, and Joseph's wife, visiting from out of state — were locking the cabin and leaving for an excursion. Richert presented a business card identifying himself as "Zoning Administrator Assistant" and stated he was there to check whether the required permit card was displayed in a visible window.

230. Joseph Flair told Richert that they were "just renting." Flair was unfamiliar with the Township's STR regulatory scheme, the Certificate requirement, and Plaintiffs 'legal rights concerning the governmental inspection. Flair later wrote to Plaintiffs:

> "He had his card and said he just needed to see the outside and I told him that if he was not going inside that he could look at the house from the outside so he started down the driveway and I took a picture of the back of his vehicle…I then started to follow him but he was around to the side of the house by the time I got to the front."

231. Richert proceeded around the cabin perimeter, including areas not visible from the driveway, and then inspected the exterior of the adjoining garage, including its back and sides.

232. Once Richert had parked at the end of Plaintiffs 'driveway, he was in a position to conduct the Township's stated visual check by observing whether a Certificate was displayed in any window visible from the driveway. The Township

described no broader inspection method. Richert's subsequent movement around the cabin and adjoining garage extended beyond the stated visual check.

233. Richert inspected all 45 permitted STR properties over three days. Eleven were found noncompliant with the Certificate-display requirement. Township records do not document the inspection method used at each property, whether consent was obtained, or whether Richert entered areas surrounding private residences that were not visible from a street or driveway.

234. On October 8, 2025, Hockings sent a form letter to the eleven noncompliant property owners. The letter's first paragraph states that the survey was conducted to verify compliance with the requirement that the "Certificate must be displayed in a visible first floor window at all times." Its second paragraph instructs noncompliant owners to display the Certificate "in a first floor window or similar location which can be publicly seen from the street or your driveway." Those are two different standards, in the same letter, from the same official.

235. At the time of the inspection, Plaintiffs did not possess a Certificate because the Township had mailed it to the wrong address, an error Treasurer Asselin later acknowledged. The Clerk also told Plaintiffs that there was "a pile of blue cards that people had not picked up or asked to be mailed."

236. After changing their local contact agent, Plaintiffs repeatedly requested an updated Certificate on August 24, August 28, and October 15, 2025. The Township did not provide one.

237. On August 29, 2025, Plaintiffs delivered written notice to the Township, Probst, and the Zoning Department that the Anam Cara Property was private and that no Township official, employee, agent, or representative was authorized to enter it without Plaintiffs ’prior written permission except in exigent circumstances. Plaintiffs further advised that Washington Mine Road was private and that Township officials lacked permission to use it absent permission from an owner.

238. The Township subsequently stated that “there will be at a minimum an annual visual inspection to ensure permits are properly posted for short-term rentals” and that permits “must be visibly posted for any inspector to read.”

239. Section 18.5.4 of Zoning Ordinance 1.7 provides: “The Zoning Administrator shall make as many inspections of buildings or premises as necessary in order to properly carry out the enforcement of this Ordinance or any permit, approval, or condition of a permit or approval, or order under this Ordinance.” Section 18.5.4 contains no warrant requirement, consent requirement, advance-notice requirement, limitation on inspection scope, or mechanism for pre-compliance judicial review.

240. The Certificate-display and inspection requirements applied only to permitted STR operators. Long-term rentals, other lodging establishments, and other Township businesses were not subject to the same Certificate-display requirement, and the approximately nineteen STRs the Township treated as outside the STR ordinance—including Probst's two STRs—were not subject to the inspection program.

**XV. THE 2025 STR CAP REDUCTION**

241. On April 29, 2025, former Planning Commission member Kerrie Richert proposed reducing the STR cap from 18% to approximately 13%, writing to Planning Commission Chair Bonde that there appeared to be "not much of a rush for any additional permits" and suggesting a reduction from approximately 89 allowable STRs to 65. In a subsequent email to Probst and the Board, Richert explained that when the original 18% cap was selected, the Planning Commission "was not certain of the number of existing rentals" and "did not want to exclude anyone who was already operating a rental unit…a majority of the respondents to the Commission's survey at that time had a negative attitude about short term rentals and wanted them restricted and regulated…" The Survey results did not show that a majority of respondents held a negative attitude toward STRs or favored restricting them.

242. On June 3, 2025, Plaintiffs emailed Planning Commission Chair Bonde about a possible STR cap reduction:

> "...What is the rationale for this, given the township records document zero issues with STRs? …we request the PC do a thorough analysis — including an economic impact analysis of the pros and cons of STRs in the township — before lowering the percentage of STRs allowed."

243. Bonde responded on July 8, 2025:

> "As the Planning Commission could not be certain of the exact number of STRs in the township at the time of the adoption of the ordinance, the Planning Commission's recommendation to the board of 18% was to ensure that anyone who would be eligible was not excluded. As it stands, given the number of permits issued, the Planning Commission's recommendation was in excess."

244. The public Planning Commission record concerning the proposed cap reduction before the October 23 hearing consisted principally of Richert's April proposal, placement of the issue on a future-agenda list, and his renewed request in October. No economic-impact analysis or comparable study appears in the record.

245. At the October 23, 2025 public hearing, four Planning Commission members were present: Bonde, Olson, Spear, and Healy. Bonde held one STR permit and Healy held three.

246. Probst appeared and endorsed the reduction, stating that the proposed changes "made a lot of sense." He was the only attendee recorded as speaking in favor of reducing the cap. The Commission then voted 4-0 to recommend reducing the cap from 18% to 10%. Neither Bonde nor Healy disclosed a conflict of interest at that meeting.

247. During the same period, four additional STR permits were issued, bringing the permit total to 50 by November 3, 2025.

248. Other STR owners submitted written opposition questioning the absence of analysis and warning that a lower cap could restrict property ownership and STR eligibility without a demonstrated regulatory or land use need.

249. On November 24, 2025, the Board considered the proposed cap reduction at a Special Meeting. Probst recused himself from discussion and voting. The Board voted 4-0 to return the matter to the Planning Commission to reconsider the percentage and calculation and separately imposed an immediate six-month moratorium on new STR permits.

250. The Planning Commission minutes later explained that the Board had rejected the proposed 10% cap because the number of permits already issued exceeded the number that percentage would allow.

251. At the December 4, 2025 Planning Commission meeting, only Bonde, Olson, and Healy were present. Bonde and Healy then disclosed that they might have conflicts because they held STR permits. The minutes state that they were nevertheless permitted to participate because their recusals would eliminate a quorum. Healy abstained; Bonde and Olson voted to recommend an 11% cap.

252. On December 8, 2025, the Board adopted the 11% cap, reducing the allowable number of permits from 88 to 53. Probst recused himself. At the time, 50

STR permits had already been issued, leaving only three available permit slots. The Board simultaneously rescinded the moratorium imposed two weeks earlier.

253. The reduction from 18% to 11% was not accompanied by any newly identified STR problem, economic analysis, housing analysis, or documented change in Township conditions.

254. The Township's Findings of Fact cited Master Plan provisions calling for the Township to "evaluate the performance and issues" of the STR regulations and to "continue to monitor and enforce STR standards." The record contains no documentation that such evaluation occurred before the cap was reduced. Earlier FOIA responses had confirmed that, as of the date of those responses, the Township had documented no STR complaints, conducted no economic analysis of the ordinance, and performed no study attributing any housing shortage to STRs.

255. The cap reduction also materially increased the development risk described above. With only three permit slots remaining, an owner required to construct a dwelling before applying for an STR permit could lose eligibility during construction through exhaustion of the Township-wide cap, even before considering the ordinance's separate spacing restriction.

## XVI. THE STR LANDSCAPE IN 2026

256. As of August 1, 2026, nearly three years after adoption of the STR ordinance, the Township had issued 49 STR permits to 39 owners, little changed from the first permitting cycle.

257. In addition, four owner-operators continued to operate approximately nineteen STR units that the Township determined were exempt from the STR ordinance, including Probst's two RS-1 STRs, Anne Smith's RS-1 STR, Fresh Coast's ten units, and Cedar Point's six units.

258. Thus, approximately 28% of the Township's known STR activity remained outside the permit program and its associated fees, inspection requirements, local-contact requirements, Certificate-display requirements, and other standards, while those requirements continued to apply to Plaintiffs and other permitted STR operators.

## XVII. DAMAGES

259. As a direct and proximate result of the conduct alleged above, Plaintiffs have suffered substantial economic and non-economic harm. Their damages include lost past and future STR income, increased development and construction costs resulting from delay, diminution in the value and development utility of their Property, out-of-pocket expenses, loss of use and enjoyment, and reputational and personal harm.

260. Plaintiffs acquired and assembled the five contiguous Anam Cara parcels over many years with a documented plan to develop additional modest cabins for use by their children, grandchildren, family, and friends, with STR income offsetting ownership and maintenance costs when the cabins were not in family use. At minimum, Plaintiffs intended to construct four additional two-bedroom cabins, one on each of Lots 5 through 8.

261. Plaintiffs 'lost-income projections are grounded in the actual performance of the existing Lot 4 cabin. Since beginning STR operations in 2021, the cabin has rented approximately 98 to 137 nights annually, with nightly rates increasing from approximately $435 in 2021 to approximately $651 in 2026.

262. Based on that operating history, Plaintiffs presently estimate historical lost net operating income through 2026 of approximately $740,000 to $1.12 million and future lost net operating income through 2036 of approximately $4.4 million to $9.3 million. These estimates are preliminary and subject to additional analysis.

263. Plaintiffs have also suffered increased development costs. Cabins that Plaintiffs intended to begin constructing years earlier must now be built at higher labor, materials, and contractor costs. Quantification of those increased costs will be subject to further analysis.

264. Defendants 'actions have also impaired the value and development utility of Plaintiffs 'Property by restricting or creating substantial uncertainty

regarding STR use and future development rights on Lots 5 through 8. Any resulting diminution in value will be subject to additional analysis.

265. Plaintiffs have incurred additional out-of-pocket expenses associated with repeated permit applications, administrative proceedings, FOIA requests, professional consultation, travel, and efforts undertaken to respond to and document the Township's actions.

266. The harm has not been solely economic. Plaintiffs 'long-standing plan for Anam Cara was to create a multi-generational family property where additional cabins could be used by their children, grandchildren, extended family, and guests. The years consumed by permit disputes and efforts to protect their asserted property rights delayed and interfered with those plans and diminished Plaintiffs 'use and enjoyment of the Property.

267. Plaintiffs also suffered reputational and relational harm arising from the September 4, 2025 proceedings described above, in which their withdrawn rezoning application was publicly presented as an active request without disclosure of its withdrawal or equal-treatment purpose, generating organized opposition from neighbors without Plaintiffs 'knowledge or contemporaneous opportunity to correct the record.

268. Plaintiffs seek compensatory damages in amounts to be established through discovery and proof. They also seek punitive damages under 42 U.S.C. §

1983 against the individual Defendants where supported by the evidence and applicable law; punitive damages are not sought against Eagle Harbor Township. The specific legal basis for damages and other relief is set forth in the Counts below.

## XVIII. THE INTERRELATED COURSE OF CONDUCT UNDERLYING PLAINTIFFS 'CONSTITUTIONAL CLAIMS

269. The conduct alleged above formed an interconnected course of official action affecting Plaintiffs 'use and development of their Property, their treatment under the Township's STR regulatory scheme, their exercise of protected petitioning rights, and the Township's entry onto and inspection of their Property.

270. Plaintiffs do not allege that every incomplete disclosure, survey defect, erroneous statement, conflict of interest, procedural irregularity, disputed interpretation, or unfavorable decision independently constitutes a federal constitutional violation. Those facts are alleged, as applicable, as direct deprivations or as evidence of discriminatory purpose, economic self-interest, arbitrariness, bad faith, pretext, standardless administration, official policy or ratification, causation, reliance, and injury.

271. Eddy's incomplete disclosure after Plaintiffs requested participation; the incumbent composition and grandfathering expectations of the Focus Group; the exclusion of unimproved-property owners from the Survey; the Survey's failure to measure support for the restrictions adopted; the mismatched Findings of Fact; the

absence of an STR policy or identified STR problem in the Comprehensive Plan; the personal and economic interests of participating officials; the preservation, exemption, or expansion of favored operations; and the shifting treatment of Plaintiffs 'applications and permits collectively support the constitutional claims alleged below.

272. Plaintiffs plead the following constitutional theories cumulatively and, where appropriate, in the alternative. Identification of a particular application, permit, parcel, or minimum protected interest in one Count does not waive a broader property interest, alternative characterization, or separate constitutional protection supported by the pleaded facts.

**COUNT I – DEPRIVATION OF EQUAL PROTECTION**
*(U.S. Const. amend. XIV; 42 U.S.C. § 1983)*
*(Against Defendant Eagle Harbor Township and Defendants Richard Probst Jr. and Susan Hockings in their individual capacities)*

273. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

274. The Equal Protection Clause of the Fourteenth Amendment prohibits governmental actors from intentionally treating persons differently from others similarly situated in relevant respects without a rational basis for the difference in treatment. In a class-of-one claim, the relevant comparators depend upon the particular governmental action challenged.

275. Plaintiffs do not allege that every STR operator or property owner in Eagle Harbor Township is similarly situated for every purpose. Rather, as alleged below and in the incorporated factual allegations, Plaintiffs challenge both differential classifications created by the STR ordinance itself and materially different treatment in the Township's permitting, grandfathering, exemption, rezoning, and administrative decisions.

**A. Unequal Treatment of Plaintiffs 'R-3 Property**

276. As alleged in Paragraphs 124 through 136, forty-nine STR permit applications were submitted before the April 30, 2024 grandfathering deadline. Forty-six were initially approved. The only three applications initially denied were Plaintiffs 'applications for Lots 5, 7, and 8, each denied because the Township considered the lots "vacant."

277. Numerous applications that Marshall approved were missing information required by the Township's application materials. After becoming Zoning Administrator, Hockings contacted those applicants and afforded them an opportunity to cure the deficiencies. Plaintiffs 'Lots 5, 7, and 8 applications, by contrast, were denied because the planned dwellings had not yet been constructed. As alleged above, those dwellings had not been completed because Plaintiffs had curtailed their previously lawful development while the Township was rapidly

developing STR restrictions that threatened to eliminate or materially restrict the intended STR use of the dwellings.

278. Permit #45 for Lot 6 presents a related but distinct example of unequal administration. Marshall approved the permit after concluding that Lot 6 contained "a physical structure that can be rented." Plaintiffs 'application made clear that the proposed STR was a future two-bedroom dwelling, not the existing seasonal Point House (which had, in fact, been rented on rare occasions to STR guests for daytime use). After succeeding Marshall, Hockings applied a different interpretation and revoked Permit #45 because the existing Point House was not a dwelling suitable for overnight STR rental use. The revocation therefore resulted from Hockings ' rejection of her predecessor's interpretation, rather than from an undisclosed deficiency in Plaintiffs 'application.

279. Before adoption of the STR restrictions, Plaintiffs had begun lawful development of additional dwellings on Lots 5 through 8 under the zoning ordinance then in effect, undertaking substantial planning, professional work, expenditures, advertising, and other development activity.

280. The Township's in-development STR ordinance with its restrictions—including the proposed cap, spacing limitation, grandfathering rules, per-owner limitation, and one-STR-per-parcel limitation—created substantial uncertainty as to whether dwellings lawfully constructed under the existing zoning ordinance would

remain eligible for STR use by the time construction was completed, especially given the Township's acknowledged rush to pass the ordinance. Plaintiffs curtailed further development rather than incur substantial additional construction costs without knowing whether the completed dwellings could lawfully be operated as STRs.

281. The Township thereafter relied upon the absence of completed dwellings to deny Plaintiffs 'permit applications as "vacant land" and later formalized a policy prohibiting pre-construction STR permits, while providing no mechanism by which an owner could establish or reserve STR eligibility before incurring the substantial expense of completing construction.

**B. Unequal Grandfathering Treatment**

282. As alleged in Paragraphs 137 through 149, the Township also applied materially different grandfathering principles.

283. Plaintiffs contended that their existing STR use involved their integrated five-parcel Property and that their extensive pre-enactment development, advertising, reservations, expenditures, and communications supported protection of their planned additional STR use. The Township recognized grandfathered status only for Lot 4.

284. By contrast, the Township later granted grandfathered status to Thomas Wakeman based upon "pre-ordinance usage as an STR, though years had lapsed."

The Township therefore accepted substantially attenuated prior STR use as sufficient for Wakeman while refusing to recognize Plaintiffs 'extensive and ongoing pre-enactment reliance and development activity beyond Lot 4.

**C. Fresh Coast and Cedar Point: Complete Exemption of Same-District R-3 Operations**

285. Fresh Coast, Cedar Point, and Plaintiffs 'Property are all located in R-3. Fresh Coast and Cedar Point operate multiple transient lodging units, yet the Township treats both as entirely outside the STR regulatory program, while subjecting Plaintiffs 'Property to that program and its restrictions.

286. The Township has offered two explanations for this treatment. First, Township officials have characterized Fresh Coast and Cedar Point as existing or "historical" lodging facilities or resorts, and Hockings stated that they had "historically operated as lodging facilities or resorts prior to the adoption of the current STR ordinance and have continued to do so." Second, Hockings stated that STR activity is "regulated differently depending on the zoning district in which the property is located."

287. Neither explanation accounts for the complete exemption challenged here. The STR ordinance contains no express provision exempting a preexisting lodging or resort operation from the entire STR regulatory program merely because its use predated the ordinance. Moreover, Hockings 'zoning-district explanation does

not distinguish Fresh Coast or Cedar Point from Plaintiffs: all three properties are located in R-3.

288. The differential treatment is especially significant because the Township permitted Fresh Coast and Cedar Point to continue and expand their preexisting legal nonconforming operations, as alleged in Paragraphs 139 through 145, while Plaintiffs 'lawful development of additional R-3 dwellings was interrupted by the developing STR restrictions and thereafter denied STR eligibility because those dwellings had not been completed.

289. Fresh Coast and Cedar Point therefore provide same-district comparators to Plaintiffs with respect to the Township's asserted land-use and STR-regulatory objectives. Their substantially more intensive lodging operations are completely outside the STR regulatory program while Plaintiffs 'R-3 Property is subjected to it.

**D. Preferential Treatment of RS-1 and RS-2 STRs**

290. As alleged in Paragraphs 89 through 103, the preferential treatment of RS-1 and RS-2 STRs developed in two distinct stages.

291. First, during ordinance development, consultant Patrick Coleman proposed that STRs be "allowed by right, with conditions, in all Zoning Districts." On May 4, 2023, however, the Planning Commission changed STR use in RS-1 and

RS-2 from "By Right with Conditions" to "By Right," without a recorded explanation for the departure from Coleman's uniform treatment.

292. That classification materially benefited RS-1 and RS-2 STR operators by removing conditions applicable to STRs classified "By Right with Conditions," including restrictions affecting cap limitations, spacing requirement, ownership limits, and continuation or transfer of STR use. The Township's asserted concerns underlying STR regulation—including density, congestion, parking, noise, neighborhood impacts, and concentration of STR ownership—do not, on the facts alleged, provide a rational basis for imposing those restrictions upon Plaintiffs' remote R-3 Property while categorically relieving RS-1 and RS-2 STRs from those same restrictions.

293. Second, the Township later went substantially further and administratively treated RS-1 and RS-2 STRs as exempt from the STR regulatory program altogether.

294. That broader exemption followed Probst's earlier written inquiry asking whether his own RS-1 rentals should be excluded from "any/all" provisions of the proposed ordinance and his subsequent statements suggesting that his RS rentals "may not even be controlled by this particular ordinance."

295. The enacted ordinance does not state that RS-1 and RS-2 STRs are exempt from the STR regulatory program. It states that its standards apply to "all

STRs in Eagle Harbor Township," requires existing STR owners to register, makes it a violation for "anyone" to advertise an STR without first obtaining a permit, and defines "By Right" as requiring compliance with applicable nondiscretionary standards.

296. Nevertheless, the Township interpreted "By Right" to mean that RS-1 and RS-2 STRs require no STR permit and, as administered, are outside the accompanying STR regulatory requirements. Probst's two RS-1 STRs and Anne Smith's RS-1 STR have operated under that exemption.

297. When Plaintiffs formally complained about those unpermitted operations, Hockings reaffirmed that "[a]ny property providing lodging within the RS district is not required to obtain a separate STR permit under the current ordinance," without identifying an ordinance provision expressly creating that exemption.

298. Thus, although the Township may distinguish RS properties from Plaintiffs 'R-3 Property for purposes of the legislative "By Right" classification, that zoning distinction does not itself explain the Township's separate administrative decision to exempt RS STRs from nondiscretionary requirements that the enacted ordinance states apply to "all STRs."

**E. The September 4, 2025 Unequal-Treatment Proceeding**

299. The Township's 2025 RS rezoning initiative provides another discrete comparator set, as alleged in Paragraphs 183 through 216.

300. On June 22, 2025, after learning that the Township was considering RS rezoning for several other STR-related properties, Plaintiffs filed a formal application requesting rezoning of their Property to RS. Plaintiffs expressly framed the application as a request for equal treatment with the other STR properties then under consideration, not as an independent effort to obtain preferential zoning or to operate a resort or commercial lodging establishment.

301. On July 14, 2025, Plaintiffs withdrew the formal rezoning application while expressly maintaining their demand that the Township treat their Property consistently with whatever disposition the comparator properties ultimately received.

302. By August 7, 2025, the Planning Commission had recommended no zoning change for each of the STR-related comparator properties. That outcome effectively resolved the equal-treatment zoning issue: those properties would remain in their existing zoning classifications, and Plaintiffs 'Property would likewise remain in its existing zoning classification.

303. Nevertheless, on September 4, the Planning Commission publicly treated Plaintiffs 'withdrawn application as though it remained pending, described Plaintiffs as seeking RS zoning "to allow them to have multiple rentals…without

needing an STR Permit," received organized opposition directed at Plaintiffs' Property, and discussed the matter in Plaintiffs' absence and without notice to them.

304. None of the comparator properties considered in the same rezoning initiative was subjected, after the Commission had recommended no zoning change, to a comparable proceeding involving organized public opposition and presentation of a no-longer-pending rezoning request as though it remained active.

**F. Evidence of Intentional and Selective Treatment**

305. The foregoing disparities did not occur in isolation. The incorporated factual allegations show selective treatment of Plaintiffs beginning during development of the STR regulatory scheme and continuing through its administration.

306. In July 2021, Moss informed then-Zoning Administrator Bill Eddy that Plaintiffs were operating an STR, described Plaintiffs' plans for additional STR development, and expressly asked to be included in further discussions concerning regulation. Although the Planning Commission had already begun formally considering STR regulation, Eddy characterized the matter merely as discussions among "some folks in Eagle Harbor" and did not disclose the ongoing Planning Commission process. During the same regulatory period, other STR owners and interested persons participated directly through the Township's Ad Hoc STR Focus Group. Plaintiffs were not included.

307. Plaintiffs allege that this selective exclusion is evidence bearing upon the intent and non-neutrality of the Township's subsequent treatment, rather than a separate claim that Plaintiffs possessed an independent constitutional right to participate in the legislative process.

308. The Township relied upon the post-adoption Cover Letter's "vacant lot, etc." language when denying Plaintiffs 'applications even though that restriction did not appear in the enacted ordinance. When Plaintiffs later relied upon other Cover Letter language favorable to them, including the statement that the permit applied only to rental of an "entire dwelling unit," the Township treated the Cover Letter as nonbinding and removed the language.

309. At the same time, the Township declined to enforce the same Cover Letter's statement that "anyone operating or advertising a Short Term Rental in Eagle Harbor Township must have a STR Permit" against RS operators, Fresh Coast, or Cedar Point.

310. Hockings denied Plaintiffs 'December 29, 2025 Lot 8 application on January 5, 2026, asserting under oath that the denial reflected existing Township practice and "uniform enforcement," while on the same day recommending adoption of a new written policy prohibiting pre-construction STR permits. The Board formally adopted that policy seven days later.

311. Hockings also rejected Plaintiffs ’proposal to use existing Permit #44 for a lawful second dwelling on the same Lot 4 parcel after ceasing STR use of the existing cabin. The proposal involved the same owner, same parcel, and only one STR, and would not have affected the Township-wide cap, spacing, ownership limits, STR density, or the one-STR-per-parcel requirement. Hockings nevertheless concluded that Permit #44 could not be used for the new dwelling, stating that “not prohibited” did not mean “allowed,” even though the ordinance expressly prohibited permit transfers only between different properties or different owners and did not expressly prohibit the same-parcel change Plaintiffs proposed.

312. Considered together with the comparator-specific disparities alleged above, these events support a reasonable inference that Plaintiffs ’differential treatment was intentional rather than the incidental result of neutral and consistently applied standards.

**G. Individual Defendants**

313. Defendant Probst personally participated in development and administration of the STR regulatory scheme while operating two STRs in RS-1. Upon disclosing that financial interest, he expressly asked whether his STRs should be excluded from “any/all” provisions of the proposed ordinance, later acknowledged the appearance that his continued participation could be viewed as an effort to limit competition, and nevertheless continued participating in STR matters.

314. Plaintiffs allege that Probst knowingly participated in and contributed to the unequal classification and administration challenged in this Count while maintaining a direct financial interest in the regulatory treatment benefiting his own STR properties.

315. Defendant Hockings personally administered the STR regulatory scheme as Zoning Administrator. As alleged above, she revoked Permit #45, denied Plaintiffs 'subsequent permit applications, enforced the vacant-land and pre-construction restrictions against Plaintiffs, rejected Plaintiffs 'proposed same-parcel use of Permit #44, continued the exemptions afforded to RS properties, Fresh Coast, and Cedar Point, rejected Plaintiffs 'formal complaints concerning those unpermitted operations, and prepared the September 4 Zoning Administrator Report concerning Plaintiffs 'withdrawn rezoning application.

316. Plaintiffs allege that Hockings personally participated in the intentional and materially differential administration of the STR regulatory program challenged in this Count.

**H. Municipal Liability and Injury**

317. The unequal treatment alleged in this Count resulted from official municipal action, including zoning classifications adopted by the Township, Board-approved administrative materials and resolutions, permit and enforcement

decisions, interpretations maintained by Township officials, Board action and ratification, and established administrative practices.

318. Those enactments, decisions, interpretations, ratifications, and practices constituted municipal policy or custom and were moving forces behind the unequal treatment of Plaintiffs, rendering Eagle Harbor Township liable under 42 U.S.C. § 1983.

319. The materially different treatment alleged above lacked a rational relationship to legitimate governmental objectives and, alternatively and additionally, was motivated in material part by favoritism, self-interest, animus, or other arbitrary considerations unrelated to legitimate land-use distinctions.

320. As a direct and proximate result of the violations alleged in this Count, Plaintiffs suffered the economic, property-related, reputational, and other compensable injuries alleged in Paragraphs 259 through 268.

321. Plaintiffs seek declaratory and injunctive relief against Eagle Harbor Township, compensatory damages against the liable Defendants, punitive damages against Probst and Hockings where supported by the evidence and applicable law, reasonable attorney fees and costs under 42 U.S.C. § 1988, and such other relief as the Court deems appropriate.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A. Declare that Defendants violated Plaintiffs ’rights under the Equal Protection Clause of the Fourteenth Amendment;

B. Declare that the Township’s denial of grandfathered treatment to Plaintiffs, while applying materially more favorable grandfathering standards to other property owners, violated the Equal Protection Clause;

C. Declare that the Township’s classification of STRs in RS-1 and RS-2 as “By Right,” while subjecting Plaintiffs ’R-3 STR use to materially more restrictive “By Right with Conditions” requirements, violated the Equal Protection Clause as alleged in this Count;

D. Declare that the Township’s subsequent administration of the RS-1 and RS-2 “By Right” classification as a complete exemption from STR permit requirements and other nondiscretionary standards stated to apply to “all STRs,” while enforcing those requirements against Plaintiffs, violated the Equal Protection Clause;

E. Declare that Eagle Harbor Township’s treatment of Fresh Coast Cabins and Cedar Point Cabins as entirely outside the STR regulatory program, while subjecting Plaintiffs ’same-district R-3 Property to that program and its restrictions, violated the Equal Protection Clause in the absence of a constitutionally sufficient basis for the differential treatment;

F. Declare that the Township's materially different treatment of Plaintiffs in the permitting, grandfathering, exemption, rezoning, and administration of its STR regulatory program violated the Equal Protection Clause;

G. Permanently enjoin Defendants from continuing the unequal interpretation, implementation, administration, or enforcement of the Township's STR regulatory program against Plaintiffs;

H. Vacate, set aside, or grant other appropriate equitable relief from Eagle Harbor Township's denials of Plaintiffs 'STR permit applications for Lots 5, 7, and 8 and its revocation of Permit #45 for Lot 6, to the extent those actions resulted from the unconstitutional unequal treatment alleged in this Count;

I. Enjoin Eagle Harbor Township from applying the STR cap, spacing limitation, per-owner limitation, one-STR-per-parcel limitation, vacant-land restriction, or other STR restrictions to Plaintiffs in a manner that denies Plaintiffs equal treatment relative to materially similarly situated property owners or STR operators;

J. Award Plaintiffs compensatory damages against the liable Defendants in an amount to be established through discovery and proof;

K. Award punitive damages against Defendants Richard Probst, Jr. and Susan Hockings, in their individual capacities, where supported by the evidence and applicable law;

L. Award Plaintiffs their costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

M. Grant such other and further relief as the Court deems just and proper.

**COUNT II – VIOLATION OF SUBSTANTIVE DUE PROCESS**
*(U.S. Const. amend. XIV; 42 U.S.C. § 1983)*
*(Against Defendant Eagle Harbor Township)*

322. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

323. This Count concerns, among other things, the Property and its integrated development; the zoning framework existing when Plaintiffs began developing the Property; Plaintiffs ’lawful STR operation and pre-regulation expenditures; the development, adoption, and administration of the STR regulatory scheme; the Survey, Findings of Fact, Comprehensive Plan, and numerical cap; the personal and economic interests of participating officials; the treatment of incumbent and favored transient-lodging operations; the issuance, administration, and revocation of Plaintiffs ’permits; the preconstruction barrier; Plaintiffs ’reliance and forced forbearance; and Plaintiffs ’injuries.

324. The Due Process Clause protects property owners from deprivation of constitutionally protected property interests through governmental action that is arbitrary and capricious, has no foundation in reason, or bears no rational relationship to a legitimate governmental objective. It also requires laws regulating

property to provide fair notice of what they require and sufficiently ascertainable standards to prevent arbitrary administration.

**A. Protected Property Interests**

325. As alleged in Paragraphs 32–36, Zoning Ordinance 1.6 permitted Tourist Homes By Right in Plaintiffs 'R-3 district, permitted qualifying parcels to contain a principal dwelling and a second dwelling, and required no discretionary rezoning or special-use approval for a qualifying Tourist Home. Before the challenged restrictions, Plaintiffs lawfully operated the Lot 4 STR as part of the integrated Property and made documented pre-regulation expenditures exceeding $330,000 in furtherance of their overall development plan, including—but not limited to—the acquisition of Lot 8, surveys, lot-line work, architectural planning, and other preparations.

326. As alleged in Paragraphs 124–132, the Township issued Permit Nos. 44 and 45 after receiving Plaintiffs 'applications and supporting materials. Plaintiffs allege that Permit No. 45 was validly issued after their application disclosed that the requested Lot 6 STR was a cabin to be constructed, and that its later revocation impaired an existing permit rather than merely denying a first-time application.

327. Plaintiffs possessed protected property interests, at minimum, in their ownership and lawful use of the Property, their existing Lot 4 STR operation, and the uses authorized by Permit Nos. 44 and 45. Plaintiffs further allege, separately

and in the alternative, protected interests in the lawful use and development of Lots 5, 6, 7, and 8 under the nondiscretionary By Right zoning framework existing when Plaintiffs undertook their integrated development; in the continuation and documented expansion of their existing integrated STR use; and in grandfathered status under the ordinance's stated criteria. As alleged in Paragraphs 32–36, 72–74, 124–158, and 161–165, those interests are supported by Plaintiffs 'ownership and integrated development of the contiguous Property, pre-regulation expenditures and development activity, existing lawful STR operation, issued permits, Township approvals and representations, and the treatment of comparable continuing transient-lodging operations.

328. Plaintiffs do not rely upon planning or expenditures alone as conclusively vesting an STR use in every proposed dwelling. They plead the foregoing ownership, lawful-use, permit, By Right, grandfathering, reliance, and development interests cumulatively and in the alternative. Those interests and the substantive theories alleged in this Count are not limited to the validity or scope of Permit No. 45.

**B. Irrational Design and Application of the STR Regulatory Scheme**

329. A zoning enactment may violate substantive due process when the means selected have no rational relationship to legitimate land-use concerns, either generally or as applied to the affected property.

330. As alleged in Paragraphs 20, 37–108, and 137–149, the Township developed and adopted the challenged restrictions while lacking reliable Township-specific information concerning the number, location, or effects of STRs; excluded Plaintiffs and owners of unimproved property from material portions of the process while incumbent operators anticipated grandfathering; relied upon a Survey that did not disclose or measure support for the restrictions ultimately adopted; adopted Findings that did not rationally answer material questions or connect several restrictions to identified conditions; relied upon Comprehensive Plan language that identified no STR-specific problem or policy; rejected proposed geographic and reliance-based alternatives; and adopted classifications that preserved, exempted, or permitted expansion of incumbent and favored operations.

331. Considered cumulatively with the personal and economic interests alleged in Paragraphs 80–108, those facts support the inference that the challenged classifications and burdens were selected to protect incumbent and favored operations and restrict future entry rather than rationally to address noise, parking, congestion, density, housing, emergency services, neighborhood character, or ownership concentration.

332. As alleged in Paragraphs 19–36 and 139–149, that disconnect is particularly pronounced as applied to Plaintiffs ’Property. Anam Cara consists of more than twelve acres and approximately 2,500 feet of shoreline, is reached by

approximately 1.6 miles of private road followed by Plaintiffs ’private driveway, is remote from concentrated residential development, and could accommodate Plaintiffs ’planned dwellings within the underlying R-3 density limitations. The Township nevertheless applied the challenged restrictions to Plaintiffs while treating more intensive R-3 lodging operations — Fresh Coast and Cedar Point — as outside the STR program and allowing their expansion.

**C. Vagueness, Standardless Governance, and Unbounded Discretion**

333. Due process requires a land-use regime to give persons of ordinary intelligence fair notice of what it requires and to provide sufficiently ascertainable standards constraining official discretion. Plaintiffs ’challenge is not confined to dictionary definitions or a short list of disputed words. It concerns the interaction of incomplete operative standards, extra-textual criteria, reversals of announced interpretations, and materially inconsistent administration that left Plaintiffs unable to determine what was required to preserve existing permits, establish eligibility for lawful future dwellings, or use a permitted parcel without risking loss of STR rights. Mathematical precision is not required; the question is whether the scheme, considered in context and as administered, provides usable decision rules or instead leaves eligibility and enforcement to shifting, post-hoc judgment.

334. As alleged in Paragraphs 115–119, the ordinance and Board-adopted Cover Letter distinguished rental of an “entire dwelling unit” from rental of a

“portion of a dwelling unit” without supplying a standard for determining whether locked owner areas or other inaccessible portions changed the classification. Plaintiffs relied upon that distinction in withdrawing Permit No. 44; less than ten hours later, the Board removed the language, and the Township thereafter characterized the Cover Letter as nonbinding when Plaintiffs invoked it in their favor.

335. As alleged in Paragraph 163, the ordinance defines an STR as a commercial use "subordinate to the principal use of a dwelling unit," but does not state how that relationship is to be measured. Section 7.9.1.A separately provides an area, extent, and purpose standard for accessory uses and structures, although Hockings agreed that Plaintiffs' proposed second dwelling was authorized as a dwelling under Section 7.7.2 rather than as an accessory structure. Hockings nevertheless denied Plaintiffs' proposal by invoking a "primary lodging use of the property" criterion that does not appear in the operative STR permitting provision and by treating subordination as a comparison between two lawful dwellings on the same parcel. Neither the ordinance nor Hockings's decision identified whether that comparison depended upon area, frequency of use, rental revenue, duration, occupancy, or any other objective measure.

336. As applied to Plaintiffs ’existing operation and Permit No. 44, the absence of ascertainable decision rules failed to provide fair notice and permitted materially shifting administration of protected property interests.

**D. Extra-Textual, Post-Hoc, and Materially Inconsistent Requirements**

337. As alleged in Paragraphs 109–119 and 124–165, the Township repeatedly administered the STR program through requirements absent from the enacted ordinance, adopted only after their application to Plaintiffs, or treated as binding or nonbinding depending upon the result sought. Plaintiffs allege a repeated and officially maintained pattern affecting existing use, issued permits, and permit eligibility—not an isolated interpretive error.

338. As alleged in Paragraphs 111, 119, and 124–158, the ordinance did not establish the absence of a completed dwelling—or “vacant lot, etc.”—as a separate STR-permit disqualification. The Township nevertheless relied upon post-adoption Cover Letter language to deny Plaintiffs ’applications for Lots 5, 7, and 8 and, after revoking Permit No. 45, to reject Plaintiffs ’subsequent application for Lot 6 during the next application cycle.

339. As alleged in Paragraphs 153–156, Hockings denied Plaintiffs ’third Lot 8 application on January 5, 2026, asserting under oath that the denial rested solely upon the ordinance, involved no discretion, and reflected existing practice and uniform enforcement. The ordinance contained no preconstruction prohibition, and

the application was the Township's first such application, leaving no existing practice with which the denial could have been consistent. The ordinance also already addressed permit reservation through Section 18.7.12's one-year construction deadline. Nevertheless, Hockings recommended a new preconstruction prohibition that same day, and the Board adopted it seven days later as Resolution No. 2026-1.

340. As alleged in Paragraphs 161–164, the Township also imposed an unannounced prohibition against substituting a new lawful dwelling for the existing cabin covered by Permit No. 44, although the proposal involved the same owner, same parcel, only one operating STR, and no effect on the cap, spacing, ownership concentration, or STR density. Plaintiffs allege that the Township failed to identify an enacted standard or rational land-use consequence supporting that absolute prohibition.

341. As alleged in Paragraphs 124–135, Marshall issued Permit No. 45 after reviewing Plaintiffs 'application and supporting materials, and Hockings later revoked it under unchanged governing law. Plaintiffs allege that the revocation rested on a factual premise their application did not make—that the Point House was the proposed STR—and formed part of the broader use of shifting or extra-textual requirements to foreclose Plaintiffs 'development. Separately from the adequacy of

the procedures used to revoke the permit, the reversal is alleged here as substantive evidence of standardless administration, arbitrariness, pretext, reliance, and injury.

**E. Deliberately Maintained Uncertainty, Reliance, and Forced Forbearance**

342. As alleged in Paragraphs 43–79, Plaintiffs disclosed their STR development plans to Zoning Administrator Eddy and expressly requested participation in discussions concerning proposed regulation. Eddy did not disclose that the Planning Commission had formally initiated the regulatory process, retained counsel, and would shortly conduct a formative meeting attended by incumbent operators expecting grandfathered protection. While Plaintiffs were lawfully developing additional dwellings for the By Right uses then permitted, the Township's undisclosed regulatory activity created continuing uncertainty whether completed dwellings would remain eligible for their intended use. Eddy's nondisclosure is not alleged as an independent constitutional tort, but as evidence of bad faith, pretext, unequal access, reasonable reliance, and causation.

343. Plaintiffs reasonably curtailed further construction rather than incur substantial expense without knowing whether the intended STR use would remain available when construction was completed. The Township then relied upon the resulting absence of completed dwellings to deny applications for Lots 5, 6, 7, and 8 under the extra-textual "vacant lot, etc." criterion.

344. The resulting system was circular. Plaintiffs could not establish STR eligibility before constructing a dwelling, yet the cap or spacing rule could eliminate eligibility before construction was completed. The Township provided no reservation, conditional approval, priority, or comparable mechanism to preserve eligibility during construction. Plaintiffs therefore had to undertake substantial lawful construction at the risk that its intended use would become unavailable; when they reasonably declined to assume that risk, the Township used the absence of completed dwellings against them.

345. The risk is concrete and continuing. As alleged in Paragraphs 247 and 252–255, the Township had issued 50 permits when it reduced the cap to 53, leaving only three available slots while continuing to prohibit preconstruction approval. As alleged in Paragraph 256, the issued-permit count later stood at 49 as of August 1, 2026. These figures and dates should be understood together: regardless of the one-permit fluctuation, only a small number of slots remained, and Plaintiffs could not preserve eligibility during the time required to construct a dwelling.

346. Plaintiffs allege that this deliberately maintained uncertainty caused present deprivation and injury by inducing reasonable forbearance, delaying and increasing the cost of lawful development, impairing the utility of their Property and permits, and allowing the condition created by the Township's own regulatory trap to be used against them.

**F. Arbitrary Selection and Reduction of the Numerical Cap**

347. As alleged in Paragraphs 241–255, the Township selected the original 18% cap while uncertain of the number of existing STRs and with the stated objective of avoiding exclusion of existing operators. It later reduced the cap to 11%, from approximately 88 permits to 53, without identifying a new STR problem, corresponding change in Township conditions, economic or housing analysis, or reason why the selected percentage rationally corresponded to the land-use harms invoked.

348. Plaintiffs do not allege that the Township was constitutionally required to commission a particular study or select the best or least restrictive percentage. They allege that the acknowledged basis for the original cap, the later reduction without an identified change in the relevant harms, the conflicts and incumbent protection accompanying the process, the treatment of exempt operations, the Findings described in Paragraph 254, and the application of the cap to Plaintiffs' remote Property collectively support the inference that the cap operated as an arbitrary barrier to future entry and development rather than a measure rationally related to identified land-use impacts.

**G. Municipal Liability, Causation, and Injury**

349. The deprivations alleged in this Count resulted from the Township's zoning enactments; Board-adopted policies, forms, classifications, Findings, and

resolutions; decisions of the Board; official interpretations approved or ratified by the Township; and established administrative practices alleged in Paragraphs 37–165 and 241–258. Those official policies and practices were moving forces behind the violations alleged in this Count.

350. As a direct and proximate result of the conduct alleged in this Count, Plaintiffs sustained lost rental and other income, increased planning and development costs, delay in completing the lawful development of their Property, loss of use, diminution in value, expenses incurred in reliance upon the prior zoning framework and Township approvals, and the other compensable injuries alleged in Paragraphs 259–268.

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A. Declare that Eagle Harbor Township's enactment, application, and administration of its STR regulatory scheme against Plaintiffs, as alleged in this Count, violated the Substantive Due Process Clause;

B. Declare that Plaintiffs possess protected interests, including, at minimum, in the ownership and lawful use of their integrated Property, their existing STR operation, and the uses authorized by Permit Nos. 44 and 45, and, alternatively, in the By Right, grandfathering, reliance, and development interests concerning Lots 5, 6, 7, and 8 alleged in this Count;

C. Declare that the challenged cap, spacing, per-owner, one-per-parcel, grandfathering, preconstruction, and related restrictions are unconstitutional as applied to Plaintiffs to the extent they impair protected use and development without a rational relationship to legitimate land-use objectives;

D. Declare unconstitutional, as applied to Plaintiffs, the Township's use of "entire dwelling unit," "portion of a dwelling unit," and "subordinate," together with the Township's associated and shifting criteria, to the extent those standards failed to provide fair notice, supplied no sufficiently ascertainable decision rule, or permitted materially arbitrary administration of Plaintiffs 'protected interests;

E. Declare that the Township may not deprive Plaintiffs of protected interests through requirements absent from the enacted ordinance, including a preconstruction prohibition applied before its adoption or an unannounced same-owner, same-parcel structure-substitution rule;

F. Vacate, set aside, or grant other appropriate equitable relief concerning the Township's denials of Plaintiffs 'STR applications for Lots 5, 6, 7, and 8 to the extent those denials rested upon an extra-textual "vacant lot, etc." or preconstruction prohibition, including the denial of Plaintiffs 'December 29, 2025 Lot 8 application, and concerning the revocation of Permit No. 45 to the extent that revocation rested upon the unconstitutional conduct alleged in this Count;

G. Permanently enjoin the Township from applying the challenged vague, post-hoc, extra-textual, or materially inconsistent standards to deprive Plaintiffs of protected use or development of their Property;

H. Award Plaintiffs compensatory damages in an amount established through discovery and proof;

I. Award Plaintiffs their costs and reasonable attorney fees under 42 U.S.C. § 1988; and

J. Grant such other relief as the Court deems just and proper.

**COUNT III – VIOLATION OF PROCEDURAL DUE PROCESS**

*(U.S. Const. amend. XIV; 42 U.S.C. § 1983)*

*(Against Defendant Eagle Harbor Township and Defendant Susan Hockings, Individually)*

351. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

352. The Due Process Clause prohibits the government from depriving a person of a protected property interest without constitutionally adequate notice and a meaningful opportunity to be heard, before or, where circumstances require, promptly after the deprivation.

**A. The Protected Property Interest in Permit #45**

353. As alleged in Paragraphs 124 through 128, Marshall reviewed Plaintiffs' written Lot 6 application and supporting materials and approved Permit

#45 on April 30, 2024. The application identified a two-bedroom STR with occupancy for four adults, and the supporting documentation described the proposed STR as a cabin to be constructed. Neither the application nor the supporting documentation identified the existing seasonal structure later called the "Point House" as the proposed overnight STR dwelling, and Plaintiffs never represented that structure as the dwelling for which the permit was sought.

354. Marshall's approval email cited the presence of "a physical structure that can be rented" on Lot 6 to distinguish it from Lots 5, 7, and 8, which she denied as vacant land. Whatever Marshall's reference to the existing three-season structure meant, she approved Plaintiffs' submitted Lot 6 application, and neither her approval nor Permit #45 stated that the Point House replaced the future two-bedroom cabin identified in Plaintiffs' supporting materials.

355. Permit #45 was an issued governmental authorization based on that written application. It was not merely an expectation that a permit might later be granted.

**B. Deprivation Without Adequate Process**

356. As alleged in Paragraph 130, Hockings revoked Permit #45 by unilateral written notice on May 14, 2024, sixteen days after it was issued and two weeks after she assumed office, without a hearing, without referring the matter to the Planning Commission, Board of Trustees, or any other body for review, and

without affording Plaintiffs an opportunity to be heard before the revocation took effect.

357. As alleged in Paragraph 130, Plaintiffs directly disputed the stated factual premise of the revocation within hours, explaining that their application had not sought a permit for the Point House. Hockings did not address Plaintiffs' explanation that the submitted application sought authorization for the disclosed future two-bedroom cabin or identify language in the application stating that the Point House was the proposed STR dwelling.

358. As alleged in Paragraphs 131 and 132, Hockings reiterated the revocation in a June 10 certified letter and again on July 16, 2024, maintaining her position without ever addressing Plaintiffs' specific, contemporaneous factual dispute.

**C. The Post-Deprivation Process Officially Represented to Plaintiffs**

359. Plaintiffs did not file a formal appeal to the Zoning Board of Appeals from the revocation of Permit #45. Throughout the thirty-day period identified for an appeal, the Township's official website continued to identify Hockings — the official whose decision would be under review — as a member of the Zoning Board of Appeals. Plaintiffs reasonably relied on that official representation. When Plaintiffs later brought the apparent incompatibility to Township Clerk Jeane Olson's attention, Olson stated that Hockings would be removed from the ZBA listing but

did not state that Hockings had resigned or otherwise ceased serving on the Board at any earlier date, and did not identify any alternative impartial avenue that had been available to Plaintiffs during the appeal period.

**D. Alternative Grandfathering-Entitlement Theory**

360. Plaintiffs further allege, in the alternative, that Zoning Ordinance 1.7's grandfathering provision — permitting continued STR use for owners "utilizing their property as STRs" at the time of enactment — created a nondiscretionary entitlement to grandfathered status for owners satisfying its stated criteria, independent of any common-law vested-rights theory. Plaintiffs allege that they were utilizing their integrated, five-parcel Property as an STR at the time of enactment through their continuous operation of the Lot 4 dwelling, and that this integrated use extended to Lot 6 for purposes of the grandfathering standard. Plaintiffs allege that this documented, continuous integrated use, together with their pre-enactment advertising, reservations, and development activity described above, satisfied the ordinance's grandfathering standard as to Lots 5, 6, 7, and 8, and that the Township's denial of grandfathered status without a hearing deprived Plaintiffs of that entitlement without due process.

**E. Municipal and Individual Liability**

361. Hockings personally undertook the revocation by unilateral notice, without a hearing, and maintained that position after Plaintiffs informed her that the

submitted application sought the disclosed future two-bedroom cabin and had not sought authorization to rent the Point House as an independent overnight STR dwelling. Plaintiffs allege that this conduct supports Hockings' individual-capacity liability under this Count.

362. The Township assigned Hockings authority to administer STR permits, and Hockings purported to exercise revocation authority through that assigned role. Permit #45 was revoked through the exercise of that assigned authority. The Township thereafter maintained the revocation after receiving Plaintiffs' immediate written objection, without providing any predeprivation proceeding or other Township-initiated review of its factual and legal basis. Plaintiffs allege that these facts were moving forces behind the procedural deprivation alleged in this Count, rendering Eagle Harbor Township liable under Monell v. Department of Social Services, 436 U.S. 658 (1978).

363. As a direct and proximate result of the deprivation alleged in this Count, Plaintiffs sustained the injuries alleged in Paragraphs 259 through 268.

**WHEREFORE,** Plaintiffs respectfully request that this Court:

A. Declare that the revocation of Permit #45 without constitutionally adequate notice and a meaningful opportunity to be heard violated procedural due process;

B. Declare, in the alternative, that Plaintiffs possessed a nondiscretionary entitlement to grandfathered status for Lots 5, 6, 7, and 8 under Zoning Ordinance

1.7's own grandfathering provision, and that the denial of that status without a hearing violated procedural due process;

C. Vacate, set aside, or grant other appropriate equitable relief from the revocation of Permit #45;

D. Enjoin Eagle Harbor Township from revoking issued STR permits without constitutionally adequate notice and an opportunity to be heard, whether before the deprivation or, where an emergency or other constitutionally sufficient circumstance makes prior process impracticable, promptly after the deprivation;

E. Award Plaintiffs compensatory damages;

F. Award punitive damages against Defendant Hockings, individually, where supported by the evidence and applicable law;

G. Award Plaintiffs their costs and reasonable attorney fees under 42 U.S.C. § 1988; and

H. Grant such other and further relief as the Court deems just and proper.

**COUNT IV**
**FOURTH AMENDMENT — WARRANTLESS CURTILAGE AND ADMINISTRATIVE SEARCH**

*(U.S. Const. amend. IV & XIV; 42 U.S.C. § 1983)*
*(Against Defendants Kerrie Richert and Susan Hockings individually, and Eagle Harbor Township)*

364. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

365. The Fourth Amendment protects the home and its curtilage from unreasonable governmental searches. Government officials conducting zoning or code-compliance inspections may not enter constitutionally protected residential areas to obtain information without a warrant, valid consent, or another recognized exception to the warrant requirement. Plaintiffs allege three independently sufficient theories of liability, each of which standing alone establishes a Fourth Amendment violation.

**A. Leg One: Completed Curtilage Violation**

366. As alleged in Paragraphs 225 through 227, on August 20, 2025, Richert traveled approximately 1.6 miles down private, posted Washington Mine Road, then through Plaintiffs' gate and approximately 0.2 miles down Plaintiffs' private driveway, to within approximately 50 feet of the cabin.

367. As alleged in Paragraph 228, Richert parked within direct sightlines of the cabin entrance and Plaintiffs' unscreened outdoor shower — an area immediately adjacent to the cabin, not visible from any public road, and specifically advertised to guests as a secluded outdoor bathing area.

368. Richert had no warrant, Plaintiffs had given no consent, and no exigent circumstance existed. Plaintiffs allege that the warrantless intrusion was complete when Richert entered the constitutionally protected residential curtilage and positioned himself within direct sightlines of the shower, before any interaction with

Plaintiffs' guests occurred. That violation is independently sufficient regardless of any consent later given or withheld.

**B. Leg Two: Exceeded the Scope of Any Implied License or Consent**

369. As alleged in Paragraphs 229 and 230, when Richert encountered Plaintiffs' rental guests, Joseph Flair told him they were "just renting" and stated that if Richert was not going inside, he could "look at the house from the outside."

370. Plaintiffs do not rely upon the proposition that a rental guest can never consent to governmental entry onto rented premises. Rather, even assuming Flair possessed actual or apparent authority to permit some exterior observation, the Fourth Amendment limited Richert to the objectively reasonable scope of the permission conveyed — observing the house from outside, not conducting a perimeter search.

371. As alleged in Paragraphs 231 and 232, Richert proceeded around the cabin perimeter, including areas not visible from the driveway, and inspected the exterior of the adjoining garage, notwithstanding that the Township's own stated inspection method was limited to a visual check from the driveway. Richert therefore exceeded both any ordinary implied license and the reasonable scope of any permission Flair could have given, independently of Leg One and regardless of whether Flair's statement constituted valid consent for any purpose.

**C. Leg Three: The Certificate Requirement's Invalidity**

372. As alleged in Paragraph 220, the Certificate-display requirement Richert was sent to enforce does not appear in Zoning Ordinance 1.7; it was added after adoption as part of the STR Forms Packet approved by the Board on October 9, 2023, without public hearing.

373. The information the Certificate purportedly protects — local agent contact information — was already on file with the Township and could be provided to law enforcement or other authorities without requiring physical entry onto private property to inspect a window display.

374. As alleged in Paragraphs 235 and 236, Plaintiffs did not even possess a valid Certificate at the time of the inspection because the Township had mailed it to the wrong address, an error the Township later acknowledged, and the Township failed to provide a replacement despite Plaintiffs' repeated requests.

375. An inspection undertaken to enforce a requirement that was never validly adopted through the ordinance itself lacks a legitimate administrative basis. This defect is independent of, and would defeat the inspection's legality regardless of the resolution of, the consent and scope questions addressed in Legs One and Two.

**D. Individual and Municipal Liability**

376. Richert personally conducted the search and personally entered areas beyond the driveway and beyond the scope of any license or consent to obtain information for code-enforcement purposes.

377. In the Sixth Circuit, governmental officials may not conduct warrantless code-compliance searches of secluded residential curtilage without a warrant, valid consent, or another recognized exception, and officials should have known that such an inspection of remote residential property for permit-compliance purposes violated the Fourth Amendment absent constitutionally adequate precompliance review. The Sixth Circuit has confirmed those principles in Mockeridge v. Harvey, 149 F.4th 826 (6th Cir. 2025).

378. As alleged in Paragraph 224, Hockings designed, authorized, and implemented the inspection program without any warrant requirement, consent procedure, or advance-notice mechanism, and retained Richert to conduct it within days of his own confrontation with STR guests near his property, notwithstanding his documented hostility toward STR operations.

379. As alleged in Paragraphs 237 and 238, after Plaintiffs delivered written notice on August 29, 2025 that no Township official was authorized to enter their Property without permission, the Township nevertheless confirmed that "there will be at a minimum an annual visual inspection to ensure permits are properly posted." The inspection program and the Township's continued assertion of authority to

conduct recurring inspections constitute official Township policy and were moving forces behind the violation alleged in this Count.

380. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered invasion of the privacy and quiet enjoyment of their Property, interference with their STR guests and business, and the other compensable injuries alleged above.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants Kerrie Richert and Susan Hockings, individually, and Eagle Harbor Township, as applicable, and grant the following relief:

A. Declare that Richert's warrantless entry into and search of the constitutionally protected residential areas surrounding Plaintiffs' cabin on August 20, 2025 violated the Fourth Amendment;

B. Declare that Richert's perimeter inspection exceeded the scope of any implied license or consent and constituted an unreasonable search under the Fourth Amendment;

C. Declare that the Township lacked lawful authority under Zoning Ordinance 1.7 to compel compliance with the Rental Registration Certificate display requirement through physical inspection of Plaintiffs' private residential property, and that the lack of such authority further rendered the August 20, 2025 administrative search unreasonable under the Fourth Amendment;

D. Permanently enjoin Eagle Harbor Township from conducting nonconsensual administrative inspections of Plaintiffs' constitutionally protected residential property without a valid administrative warrant or other recognized exception to the warrant requirement;

E. Award Plaintiffs compensatory damages for the injuries resulting from the August 20, 2025 search;

F. Award punitive damages against Defendants Richert and Hockings, individually, where supported by the evidence and applicable law;

G. Award Plaintiffs their costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

H. Grant such other and further relief as the Court deems just and proper.

**COUNT V**
**FOURTH AMENDMENT — FACIAL CHALLENGE TO SECTION 18.5.4 OF ZONING ORDINANCE 1.7**
*(U.S. Const. amend. IV & XIV; 42 U.S.C. § 1983)*
*(Against Defendant Eagle Harbor Township)*

381. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

382. The Fourth Amendment applies to administrative inspections undertaken to enforce zoning and other regulatory codes and requires constitutionally adequate precompliance review before an owner is compelled to submit to a nonconsensual inspection.

383. As alleged in Paragraph 239, Section 18.5.4 of Zoning Ordinance 1.7 provides that the Zoning Administrator "shall make as many inspections of buildings or premises as necessary... to properly carry out the enforcement of this Ordinance." It contains no warrant requirement, consent procedure, procedure governing refusal of entry, or mechanism for precompliance judicial review before a property owner is subjected to a nonconsensual inspection.

384. To the extent Section 18.5.4 authorizes nonconsensual governmental entry into constitutionally protected areas without an administrative warrant or constitutionally adequate precompliance review, it purports to authorize inspection authority unconstrained by the safeguards the Fourth Amendment requires.

385. The constitutional deficiency is not hypothetical. As alleged in Paragraph 238, the Township conducted the August 20, 2025 warrantless inspection and, after Plaintiffs expressly prohibited further warrantless entry, reaffirmed that STR properties would receive "at a minimum an annual visual inspection." The Township has identified no warrant, consent, refusal-of-entry, or precompliance-review procedure governing those recurring inspections.

386. Section 18.5.4 applies throughout Zoning Ordinance 1.7 and is not limited to STRs; its authorization extends to inspections of "buildings or premises" whenever the Zoning Administrator considers inspection necessary for enforcement of the ordinance, any permit, approval, condition, or order.

387. Plaintiffs face a concrete and continuing threat of future application of Section 18.5.4 because they own and use property regulated by Zoning Ordinance 1.7 and the Township has expressly stated that recurring inspections of their STR property will continue.

388. Eagle Harbor Township's enactment, maintenance, interpretation, and enforcement of Section 18.5.4 constitute official municipal policy, rendering the Township liable under 42 U.S.C. § 1983.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant Eagle Harbor Township and grant the following relief:

A. Declare Section 18.5.4 unconstitutional on its face to the extent it authorizes nonconsensual governmental entry into constitutionally protected property without an administrative warrant, constitutionally adequate precompliance review, or another recognized exception to the warrant requirement;

B. Permanently enjoin Eagle Harbor Township from interpreting or enforcing Section 18.5.4 to authorize such nonconsensual entry;

C. Award Plaintiffs their costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

D. Grant such other and further relief as the Court deems just and proper.

**COUNT VI**
**FIRST AMENDMENT RETALIATION**
*(U.S. Const. amend. I & XIV; 42 U.S.C. § 1983)*
*(Against Defendant Eagle Harbor Township and Defendants Bonde and Hockings in their individual capacities)*

389. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

390. The First Amendment protects the right of citizens to speak concerning government conduct and to petition government officials for redress of grievances. Government officials may not take adverse action against a citizen because the citizen exercised those rights.

**A. Plaintiffs' Protected Petitioning Activity**

391. As alleged throughout this Complaint, Plaintiffs repeatedly exercised their First Amendment rights by raising conflict-of-interest concerns with Township officials — including a June 23, 2024 letter sent directly to Hockings challenging her undisclosed personal relationship with a Township consultant, as alleged in Paragraph 106 — disputing the factual and legal basis for the revocation of their Lot 6 permit, submitting FOIA requests and pursuing an administrative appeal, and otherwise petitioning the Township concerning its zoning and STR regulatory practices. See, e.g., Paragraphs 56, 106, 131, and 168 through 174.

392. As alleged in Paragraph 189, Plaintiffs' June 22, 2025 rezoning application was itself part of that petitioning activity. Plaintiffs expressly advised the Township that they were not independently seeking preferential Resort Services zoning or proposing a resort operation, but were using the application to request equal treatment after learning that the Township was considering more favorable RS zoning for other STR properties.

393. As alleged in Paragraphs 195 and 206, on July 14, 2025, Plaintiffs withdrew the formal application while expressly maintaining their request for equal treatment and leaving the treatment of the comparator properties to the Planning Commission. Bonde acknowledged the withdrawal, and Hockings received both the application and the withdrawal.

**B. The September 4 Adverse Action**

394. As alleged in Paragraph 202, by September 4, 2025, Plaintiffs' formal rezoning application had been withdrawn for more than seven weeks, and the Planning Commission had already recommended no zoning change for the other properties whose proposed treatment had prompted Plaintiffs' equal-treatment request. No unresolved rezoning application by Plaintiffs remained for Township action.

395. As alleged in Paragraphs 202 through 203 and 207, nevertheless, at the September 4 Planning Commission meeting, Plaintiffs' withdrawn request was

officially presented and discussed as though it remained pending. Plaintiffs received no notice that their Property or withdrawn application would be the subject of the meeting and therefore had no contemporaneous opportunity to correct the presentation.

396. As alleged in Paragraph 205, Hockings' official Zoning Administrator Report characterized the opposition at the meeting as directed to "a zoning change request by David Moss/Colleen Beaman to change the zoning of their property from R-3 (Residential) to RS-2 (Resort Service) to allow them to have multiple rentals on their property without needing an STR Permit."

397. As alleged in Paragraph 206, that characterization omitted material facts known to Hockings: Plaintiffs had withdrawn the application nearly seven weeks earlier; Plaintiffs had expressly stated that they did not seek to establish a resort or obtain preferential zoning treatment; and their request had been submitted as a means of seeking equal treatment with other STR properties then being considered for RS zoning.

398. As alleged in Paragraph 195, Bonde likewise knew that the application had been withdrawn, having acknowledged Plaintiffs' withdrawal in writing on July 15. Nevertheless, as Planning Commission Chair, she presided over the September 4 proceeding in which the withdrawn request was treated as existing Township

business and was presented to the public without disclosure of its withdrawal or Plaintiffs' stated equal-treatment purpose.

399. As alleged in Paragraph 204, the official presentation exposed Plaintiffs to extensive public opposition directed at a zoning proposal they were no longer pursuing and materially mischaracterized the purpose of the application. The minutes record a letter signed by 54 residents, five individual opposition letters, additional public opposition, and the Miller letter concerning Plaintiffs' Property.

400. As alleged in Paragraph 207, Plaintiffs did not learn until September 17 that their withdrawn request had been publicly presented in this manner. As alleged in Paragraphs 259 through 268, Plaintiffs thereafter suffered substantial damage to longstanding community relationships and reputation.

**C. Retaliatory Motive and Causation**

401. The September 4 treatment of Plaintiffs did not occur in isolation. It followed years of Plaintiffs' repeated challenges to the Township's STR regulatory process, conflicts of interest, unequal treatment, and administrative practices, as alleged throughout this Complaint, and occurred shortly after Plaintiffs had formally invoked equal treatment in connection with the proposed RS rezonings.

402. As alleged in Paragraph 73, Bonde's prior communications provide additional evidence bearing on motive. In response to a July 2023 question from Richert asking whether "someone like David Moss" might apply for a variance to

get around the anticipated STR restrictions, Bonde responded: "Probably. People like him always do."

403. The chronology and circumstances permit the reasonable inference that Plaintiffs ’protected petitioning activity, including their recent and explicit demand for equal treatment in the Township’s proposed RS rezonings, was a motivating factor in the decision to single out their withdrawn application for an official public proceeding after the comparable rezoning matters had already been resolved and to present Plaintiffs ’purpose in materially misleading terms.

404. Publicly singling out citizens before their neighbors, materially mischaracterizing their requested governmental relief, and subjecting them to an official proceeding concerning a matter already withdrawn are actions capable of deterring a person of ordinary firmness from continuing to challenge local government conduct. Plaintiffs' persistence in continuing to petition the Township does not eliminate the objectively deterrent character of the actions.

**D. Individual and Municipal Liability**

405. As alleged in Paragraph 195, Bonde personally knew that Plaintiffs had withdrawn the rezoning application, yet chaired the September 4 proceeding in which it was treated as pending Township business without disclosure of the withdrawal.

406. As alleged in Paragraphs 205 and 206, Hockings personally received Plaintiffs' application and withdrawal and therefore knew both the status and stated purpose of Plaintiffs' request, yet her official September 4 Zoning Administrator Report described it as an existing request to obtain RS zoning "to allow them to have multiple rentals on their property without needing an STR Permit."

407. Plaintiffs allege that Bonde and Hockings acted under color of state law and that their conduct was motivated, at least in part, by Plaintiffs' protected speech and petitioning activity.

408. The September 4 proceeding occurred through the Township's Planning Commission, incorporated Hockings' official Zoning Administrator Report, and was memorialized in official Township minutes. Plaintiffs allege that the challenged conduct was undertaken through official Township processes and was adopted, maintained, or ratified by the Township, rendering Eagle Harbor Township liable under 42 U.S.C. § 1983.

409. As a direct and proximate result of the retaliation alleged in this Count, Plaintiffs suffered reputational injury, damage to longstanding community relationships, personal distress, interference with their use and enjoyment of the Property and STR business, and other compensable injury alleged in Paragraphs 259 through 268.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant Eagle Harbor Township and Defendants Laura Bonde and Susan Hockings, individually, as applicable, and grant the following relief:

A. Declare that Defendants retaliated against Plaintiffs for exercising rights protected by the First Amendment;

B. Declare that the Township's September 4, 2025 treatment of Plaintiffs' withdrawn rezoning application, as alleged in this Count, constituted unlawful retaliation for Plaintiffs' protected speech and petitioning activity;

C. Permanently enjoin Eagle Harbor Township and its officials from taking adverse action against Plaintiffs because they exercise their First Amendment rights to criticize, challenge, seek records concerning, or petition the Township regarding its zoning and STR regulatory activities;

D. Award Plaintiffs compensatory damages for injuries caused by the retaliatory conduct, including reputational harm and damage to community relationships;

E. Award punitive damages against Defendants Laura Bonde and Susan Hockings in their individual capacities where supported by the evidence and applicable law;

F. Award Plaintiffs their costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

G. Grant such other and further relief as the Court deems just and proper.

**COUNT VII**
**DECLARATORY AND INJUNCTIVE RELIEF UNDER MICHIGAN LAW REGARDING UNAUTHORIZED ADMINISTRATIVE AMENDMENT OR SUPPLEMENTATION OF THE STR ZONING ORDINANCE**
*Michigan Zoning Enabling Act, MCL 125.3101 et seq., including MCL 125.3202(1); 28 U.S.C. §§ 1367, 2201–2202; Fed. R. Civ. P. 65*
*(Against Defendant Eagle Harbor Township and Defendant Susan Hockings in her Official Capacity as Zoning Administrator)*

410. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

411. This Count arises under Michigan law, including the Michigan Zoning Enabling Act. MCL 125.3202(1) requires amendments or supplements to a zoning ordinance to be adopted in the same manner required for adoption of the original ordinance. Township officials may administer and interpret the enacted ordinance, but they may not amend or supplement it administratively by creating categorical exemptions not contained in its text.

412. By treating entire categories of operating STRs as exempt from Section 10.12.33.B.7 based upon their zoning district or asserted historical status, the Township and Hockings have adopted and administered categorical rules altering the scope of the enacted ordinance without complying with the amendment

procedures required by Michigan law. These categorical rules are not merely exercises of enforcement discretion in individual cases.

413. This unauthorized administration creates an ongoing dispute concerning the meaning and application of Section 10.12.33. Plaintiffs remain subject to the Township's STR permit system, including its registration, fee, local-contact, occupancy, operational, and enforcement requirements, while other operating STRs are treated as categorically outside that system.

414. As alleged in Paragraphs 97 and 98, Section 10.12.33.B.7 makes it a violation for "anyone" to advertise an STR without first receiving a permit, and Section 10.12.33.C states that its standards apply to "all STRs in Eagle Harbor Township." Although STRs in RS-1 and RS-2 are separately classified "By Right," the ordinance defines that classification as remaining subject to applicable nondiscretionary standards and does not expressly exempt RS STRs from the permit requirement.

415. As alleged in Paragraph 99, the Township initially reflected that interpretation in its Board-adopted STR Cover Letter, stating: "Starting on May 1, 2024, anyone operating or advertising a Short Term Rental in Eagle Harbor Township must have a STR Permit." As alleged in Paragraphs 99 through 103, it subsequently administered the ordinance differently, allowing Probst's two RS-1 STRs and Anne Smith's RS-1 STR to operate without permits and treating Fresh

Coast Cabins and Cedar Point Cabins, both located in R-3, as historical lodging or resort operations outside the STR permit program.

416. As alleged in Paragraphs 143 through 145, on March 3, 2026, Plaintiffs filed five formal zoning complaints concerning those operations. Hockings rejected the complaints without identifying ordinance language creating the asserted exemptions. As alleged in Paragraph 102, she stated that property providing lodging in the RS district did not require a separate STR permit; as alleged in Paragraph 144, she relied upon historical lodging or resort status to justify the treatment of Fresh Coast and Cedar Point.

417. Plaintiffs do not seek retroactive penalties against Anne Smith, Fresh Coast Cabins, Cedar Point Cabins, or their owners, nor do Plaintiffs ask this Court to determine what fine, citation, sanction, or other enforcement measure should be imposed upon any operator. Plaintiffs seek resolution of the antecedent legal question whether the categorical exemptions applied by the Township are authorized by the enacted ordinance.

418. That dispute is material to Plaintiffs' continuing rights and presents an actual and continuing controversy. Plaintiffs remain required to maintain an STR permit and comply with its accompanying requirements while operators the Township classifies as exempt remain outside those requirements. Declaratory relief can resolve whether the asserted categorical exemptions are authorized by the

enacted ordinance without requiring the Court to manage day-to-day zoning enforcement.

419. Plaintiffs further seek prospective injunctive relief preventing the Township and Hockings from subjecting Plaintiffs to the STR permit system while simultaneously administering categorical exemptions from that same permit requirement that are not authorized by the enacted ordinance.

420. Plaintiffs have no ordinary zoning appeal through which to obtain review of these categorical interpretations. The Township did not issue STR permits, permit denials, or other comparable determinations to the operators it considers exempt; it instead treats those operations as outside the permit system altogether.

421. The controversy remains ongoing. Plaintiffs remain within the STR permit system, while the identified operations continue to advertise and operate without STR permits pursuant to the Township's asserted categorical exemptions.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A. Declare that the designation of an STR as a use "By Right" in RS-1 or RS-2 does not, standing alone, exempt that STR from the permit requirement imposed by Section 10.12.33.B.7;

B. Declare that Zoning Ordinance 1.7 contains no categorical exemption from Section 10.12.33.B.7 based solely upon an administrative characterization of a property as a historical resort or lodging operation;

C. Declare that Eagle Harbor Township and its Zoning Administrator may not create or administer categorical exemptions from the STR permit requirement that are not authorized by the enacted Zoning Ordinance;

D. Permanently enjoin Eagle Harbor Township and Hockings from administering the STR permit requirement through categorical exemptions not authorized by the enacted ordinance and from applying that requirement to Plaintiffs on materially different legal standards;

E. Award Plaintiffs their recoverable costs and, to the extent authorized in connection with the federal constitutional claims, their reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

F. Grant such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs David Moss, Colleen Beaman, and Anam Cara LLC respectfully request that this Court enter judgment in their favor and against Defendants, and grant the following relief:

A. Declare that Defendants, acting under color of state law, violated Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, as alleged in this Complaint;

B. Declare that Eagle Harbor Township may not administer or enforce its Short-Term Rental regulatory scheme through categorical exemptions,

interpretations, policies, or practices that are not authorized by the enacted language of the Township's Zoning Ordinance or that violate Plaintiffs' constitutional rights;

C. Declare that Eagle Harbor Township may not selectively administer its STR permitting, grandfathering, exemption, or related regulatory requirements among similarly situated operators in violation of the Equal Protection Clause;

D. Declare that, to the extent Section 18.5.4 of Zoning Ordinance 1.7 authorizes nonconsensual governmental entry into constitutionally protected areas without a warrant, valid consent, constitutionally adequate precompliance review, or another recognized exception to the warrant requirement, it violates the Fourth Amendment;

E. Enter preliminary and permanent injunctive relief prohibiting Defendants from enforcing or administering the Township's Short-Term Rental regulatory scheme in a manner that violates Plaintiffs' constitutional rights, including through unlawful warrantless inspections or categorical exemptions not authorized by the enacted ordinance;

F. Grant the declaratory, injunctive, and other equitable relief requested in Count VII, or such alternative equitable relief as the Court determines appropriate to ensure the uniform and lawful administration of the Township's Short-Term Rental Ordinance;

G. Award Plaintiffs compensatory damages against Eagle Harbor Township and the appropriate individual Defendants, in such amounts and against such Defendants as permitted by law, for all injuries proximately caused by Defendants ' unconstitutional conduct, including lost income, increased development and construction costs, diminution in property value and development utility, out-of-pocket expenses, loss of use and enjoyment of property, reputational and relational harm, personal distress, and all other compensable damages established at trial;

H. Award punitive damages against Defendants Richard Probst Jr., Susan Hockings, Laura Bonde, and Kerrie Richert, in their individual capacities, where the evidence establishes conduct undertaken with evil motive or intent or with reckless or callous indifference to Plaintiffs' federally protected rights;

I. Award Plaintiffs their reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988(b);

J. Award Plaintiffs their taxable costs, together with pre-judgment and post-judgment interest as allowed by law;

K. Retain jurisdiction as necessary to enforce any declaratory or equitable relief entered by the Court; and

L. Grant such other and further legal or equitable relief as the Court deems just and proper.

Respectfully Submitted,

/s/ David A. Nacht
David A. Nacht (P47034)
NACHTLAW, P.C.
Attorneys for Plaintiffs
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
Telephone: (734) 663-7550
dnacht@nachtlaw.com

Dated: September 10, 2026

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,

/s/ David A. Nacht
David A. Nacht (P47034)
NACHTLAW, P.C.
Attorneys for Plaintiffs
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
Telephone: (734) 663-7550
dnacht@nachtlaw.com

Dated: September 10, 2026